**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 14, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

QWEST CORPORATION,

    Plaintiff-Counter-Defendant - Appellant,

    v.

AT&T CORP.; AT&T COMMUNICATIONS, INC.; AT&T COMMUNICATIONS OF THE PACIFIC NORTHWEST, INC.; AT&T COMMUNICATIONS OF THE MIDWEST, INC.; AT&T COMMUNICATIONS OF THE MOUNTAIN STATES, INC.; AT&T COMMUNICATIONS OF THE SOUTHWEST, INC.,

    Defendants-Counter-Claimants - Appellees.

No. 05-1443

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 04-N-909 (MJW))**

---

B. Lawrence Theis (Steven J. Perfrement and Jennifer C. Miner with him on briefs), Musgrave & Theis, LLP, Denver, Colorado, for Plaintiff-Counter-Defendant - Appellant.

David W. Carpenter (David M. Schiffman, Sidley Austin LLP, Chicago, Illinois; Jane Michaels, Holland & Hart LLP, Denver Colorado; David L. Lawson, Paul J. Zidlicky, and Ileana M. Ciobanu, Sidley Austin LLP, Washington, D.C.; and Dina Mack, AT&T, Inc., Bedminster, New Jersey with him on briefs), Sidley Austin

LLP, Chicago, Illinois, for Defendants-Counter-Claimants - Appellees.

_____

Before **TACHA**, Chief Circuit Judge, **McKAY**, and **HENRY**, Circuit Judges.

**McKAY**, Circuit Judge. _____

Qwest Corporation ("Qwest") filed this action against AT&T Corporation and various of its regional subsidiaries (collectively, "AT&T") seeking collection of access charges allegedly accrued by the transmission of AT&T long-distance calls through Qwest's network. Qwest alleges that AT&T fraudulently concealed the nature of certain long-distance calls in an effort to avoid paying the tariffed rate for transmitting these calls. The district court granted AT&T partial summary judgment after concluding that Qwest, by executing a standard form agreement of a type long used between Qwest and AT&T to settle billing disputes, released its collection claim. Qwest filed this interlocutory appeal, arguing that any release and settlement violates the filed-rate doctrine.

## BACKGROUND

AT&T operates a nationwide long-distance network. Qwest also operates a nationwide long-distance network, and, since its acquisition of U S West Communications Inc. ("U S West") in June 2000, it has also operated a local

telephone network in fourteen states. Local exchange carriers ("LECs") originate, transmit, and terminate telephone communications to customers within a given geographic calling area. Long-distance providers, or interexchange carriers ("IXCs"), enable customers in different local exchanges to call each other, generally by routing communications from one LEC network to the IXC network and from that IXC network to a different LEC network. Qwest offers two relevant LEC services: access services and primary rate interface ("PRI") services. Access services are used, and the accompanying access charges are accrued, for connecting long-distance calls to LEC networks. PRI services are used by IXCs for end-user administrative purposes. Qwest's access charges were priced significantly higher than its PRI charges. Qwest properly listed the rates for these services in tariffs filed with the Federal Communications Commission ("FCC") for interstate communications and with the applicable state commissions for intrastate communications.

Starting in 1998, AT&T began to use phone-to-phone internet protocols ("IP telephony") to route some long-distance telephone calls over AT&T's internet backbone and through then-U S West's local exchange system. This method sent interstate calls to U S West's PRI service, and therefore allowed AT&T to avoid paying the higher access charges that would otherwise have been associated with these calls. Qwest, in its IXC operations around the same time

period, was doing the same.

In 1999, U S West filed a petition with the FCC requesting that it determine whether access charges apply to IP telephony.  That petition was withdrawn in 2001 before a decision was rendered, however, following U S West's merger with Qwest.  The FCC declined promulgating clear rules about IP telephony "in the absence of a more complete record focused on individual service offerings." *In the Matter of Federal-State Joint Board on Universal Service*, 13 F.C.C.R. 11501 ¶¶ 83, 90 (1998).  On October 18, 2002, AT&T, facing numerous demands by LECs that it pay access charges on IP telephony interexchange transmissions, filed a petition with the FCC seeking a declaration that its IP telephony practices were not subject to LEC access charges.  On April 21, 2004, the FCC issued a decision in which it ruled against AT&T.  *In the matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges*, 19 F.C.C.R. 7457 (2002) [hereinafter *FCC Order*]. The FCC's ruling applied only prospectively; it expressly declined retroactive application.

Long before this ruling, access-charge billing had been a point of contention between AT&T and U S West.  Frequent disputes over the assessment of access charges—charges that amounted to hundreds of millions of dollars per billing cycle—made company accounting and book closing difficult.  For that reason, in

1992, the companies entered into an operating agreement[1] that incorporated a "Bill Period Closure Agreement" (the "BPCA" or the "Agreement"). Qwest assumed U S West's obligations under the BPCA following the merger.

In sum, the BPCA provides for monthly settlements relating to access charges. All billing issues not encompassed by the BPCA or listed on a BPCA Supplement Exemption Form that have been or could have been asserted for all periods prior to and including the billing period closed by a specific BPCA Supplement are forever waived and released by execution of that Supplement. Section B of the BPCA Supplement specifically exempts from release issues listed under BPCA Paragraphs 2, 3, and 4 as well as issues that are expressly recorded in a BPCA Supplement Issue Exemption Form. (Appellant's App., vol. 2 at 500, § B.) While U S West initially submitted BPCA Supplement Issue Exemption Forms for several billing periods in 1999 and 2000 regarding AT&T's IP telephony routing practices in certain states, Qwest later withdrew these exemptions. The BPCA Supplements for the billing periods July 2000 through February 2004 were submitted without Exemption Forms relating to AT&T's IP telephony routing practices.

---

[1] The operating agreement stated that "[i]f any provision of this Agreement conflicts with [U S West's/Qwest's] tariffs concerning access billing, the terms of the tariff shall govern." (Appellant's App., vol. 2 at 248 (Order and Mem. of Decision at 7, No. 04-CV-909-EWN-MJW (D. Colo. June 10, 2005) (quotation omitted) [hereinafter *District Ct. Order*]).)

On April 21, 2004, the FCC Order was issued. AT&T immediately ceased routing long-distance calls using IP telephony in all states except Minnesota; the practice did not cease in that State until June 2004. On May 5, 2004, Qwest filed the instant action against AT&T to recover access charges from 2000 through 2004. Just five days later, on May 10, 2004, the parties executed a BPCA Supplement covering the February 2004 billing cycle. This BPCA Supplement did not append an Exemption Form relating to IP telephony services. According to Qwest, "lower level access billing personnel" mistakenly executed this BPCA Supplement. (Appellant's Br. at 8.) In June 2004, the parties executed a BPCA Supplement covering the March 2004 billing cycle. This time Qwest filed an Exemption Form expressly reserving its "right to recover any and all access charges" associated with AT&T's IP telephony use. (*Id.* at 261 (District Ct. Order at 20 (quotation omitted)).)

On January 5, 2005, AT&T filed four separate summary judgment motions, the first seeking partial summary judgment on all of Qwest's claims for relief relating to charges prior to March 2004, based on the May 10, 2004 BPCA Supplement. Qwest's interlocutory appeal requests reversal of the district court's award of partial summary judgment in favor of AT&T on this issue.

## ANALYSIS

We review the district court's grant of partial summary judgment *de novo*, applying the same legal standards as the district court. *E.Spire Commc'ns, Inc. v. N.M. Pub. Regulation Comm'n*, 392 F.3d 1204, 1206-07 (10th Cir. 2004). Because Qwest's claims arise in part from its allegations that AT&T violated tariffs set in accordance with §§ 203 and 206 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 203, 206, we review the district court's interpretation of that federal law *de novo*. *See Marker v. Pac. Mezzanine Fund, L.P.*, 309 F.3d 744, 747 (10th Cir. 2002).

As detailed above, this appeal arises out of a long-simmering dispute over mutual practices involving the use of IP telephony in certain circumstances. Qwest, itself a one-time user of IP telephony in its role as an IXC, claims that by using IP telephony to avoid paying access charges and relying on the BPCA Supplement to effect a "release" of the dispute, AT&T is attempting to enforce a "unilaterally selected[,] alternative off-tariff arrangement for the completion" of its calls in violation of the filed-rate doctrine. (Appellant's App., vol. 3 at 575.)

The filed-rate doctrine, or filed-tariff doctrine, provides that "'the rate of the carrier duly filed is the only lawful charge,'" and "'[d]eviation from it is not permitted upon any pretext.'" *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990) (quoting *Louisville & Nashville R.R. Co. v. Maxwell*, 237

U.S. 94, 97 (1915)).  The doctrine admits of few exceptions: "'This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress.'" *Id.* (quoting *Maxwell*, 237 U.S. at 97).  Because "Qwest's entire case is based upon the assumption that AT&T should have been paying Qwest for access services when AT&T placed terminated calls on Qwest's network through AT&T's phone-to-phone IP telephony" (Appellant's App., vol. 2 at 269 (District Ct. Order at 28)), the district court elected to view the parties' dispute by "assuming that AT&T's actions of not paying Qwest access charges for AT&T's phone-to-phone IP telephony services breached Qwest's tariffs" (*id.* at 272 (District Ct. Order at 31); *see also id.* at 274 (District Ct. Order at 33)).  Operating under this assumption, the district court held that "there must be an exception to the filed-rate doctrine for good faith settlements of legal disputes over tariffs."  (*Id.* at 276 (District Ct. Order at 35).)  It therefore concluded that Qwest, by executing the February 2004 BPCA Supplement without including the contractually mandated Exemption Form disputing AT&T's IP telephony practice, released AT&T from any filed-rate-doctrine violation.

Qwest's interlocutory appeal therefore asks this court to determine "whether, in order to settle a dispute between two parties, the parties may execute a release of any claims that a party charged a rate in contravention of the filed-

tariff [sic]." (Order and Mem. of Decision at 9, No. 04-CV-00909-EWN-MJW (D. Colo. Aug. 4, 2005).)  Taking both Qwest's and the district court's assumptions at face value, the answer to the certified question would be a resounding "No."  The filed-rate doctrine makes clear that the tariff on file sets the rate that is to be charged—no more, no less, no negotiation allowed.  *See* 47 U.S.C. § 203(c)(1); *see also Maislin*, 497 U.S. at 127; *Atchison, Topeka & Santa Fe Ry. Co. v. Bouziden*, 307 F.2d 230, 234 (10th Cir. 1962) ("The salutary purpose of the [filed-rate doctrine] is to secure uniform treatment . . . and to shut out opportunity for discrimination and favoritism."); *Empire Petroleum Co. v. Sinclair Pipeline Co.*, 282 F.2d 913, 916 (10th Cir. 1960) ("[T]he intricacies of private contract cannot be permitted to result in rate discrimination, actual or potential.").

It is our responsibility on *de novo* review, however, to look beyond these assumptions.  *See Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1291 (10th Cir. 2005) ("An appellate court can and should address a different legal question if it controls the disposition of the certified order." (citing *Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269, 1272 (10th Cir.1994))).  In so doing, we are convinced that these assumptions led to a fundamental misperception regarding the true nature of the dispute and, as a result, an inaccurate characterization of the issue.

The fact that Qwest's entire case is predicated upon the unestablished

contention that AT&T definitively violated Qwest's access service tariff is critical.

Unfortunately for Qwest, the FCC expressly refused to extend its IP telephony

ruling to permit retroactive application. The FCC clearly limited the scope of its

decision and explained the reasons for imposing that limitation:

> We do not make any determination at this time regarding the appropriateness of retroactive application of this declaratory ruling against AT&T or any other party alleged to owe access charges for past periods. While we recognize the strong interest in providing certainty—and indeed that is a primary reason for issuing this ruling—we are unable to make a blanket determination regarding the equities of permitting retroactive liability. We believe that the equitable inquiry is inherently fact-specific.

*FCC Order*, 19 F.C.C.R. at 7471 (footnote omitted). The prospective/retroactive

dichotomy established by the FCC Order is crucial to understanding this case. It

makes clear that, absent the erroneous assumptions, the dispute is not over

unilateral selection of an "off-tariff" rate, but rather over a previously unresolved

disagreement as to *which* tariffed rate applied. *See Am. Tel. & Tel. Co. v. Cent.*

*Office Tel., Inc.*, 524 U.S. 214, 223 (1998) ("[R]ates . . . do not exist in isolation.

They have meaning only when one knows the services to which they are

attached."). Consequently, reading the question presented on appeal in light of

this ruling, the real question is whether the filed-rate doctrine precludes the good

faith settlement of a dispute regarding a federal tariff's applicability in the first

instance in the absence of a regulatory or judicial ruling directly resolving the

issue. We believe that it does not, for this scenario simply does not implicate the

policies of preventing collusion and discrimination that would otherwise justify strict application of the filed-rate doctrine. Indeed, the FCC's calculated decision constitutes an implied recognition of the right to settle such a dispute, if not an outright invitation to do so.

We observe that neither party cited cases bearing directly on the instant situation, nor have we located any. AT&T relies heavily on *Panhandle Eastern Pipeline Co. v. F.E.R.C.*, 95 F.3d 62 (D.D.C. 1996), where the appeals court reasoned that simply because one party would have fared better had it vigorously pursued litigation over the filed rate, settlement of that issue was not prohibited. While that reasoning is elucidating, the highly complex factual and procedural history of that case dilutes its applicability to the instant action.

Qwest's cited cases primarily involve disputes concerning under- or over-payment of a clearly established and certainly applicable rate. Only *Bernstein Bros. Pipe & Mach. Co. v. Denver R.G.W.R. Co.,* 193 F.2d 441, 443 (10th Cir. 1951), presented a situation where "[t]he correct rate depend[ed] upon which of two tariffs [was] applicable." But that case concerned whether this court had jurisdiction to decide which rate applied, not whether the parties could have settled that issue. *Id.* at 444-45 ("If the question is which of two rates apply, and there is no contest about the reasonableness of either rate, and the tariffs contain no technical words or phrases employed in a peculiar meaning, the question is not

primarily one for the Interstate Commerce Commission, but is a judicial question of which the courts have jurisdiction in the first instance.").

Qwest attempts to fall back upon AT&T's so-called "inconsistent advocacy." (Appellant's Supplemental Authority at 2.) To that end, Qwest alleges that AT&T's position in a recent Third Circuit decision, *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525 (3d Cir. 2006), contradicts representations AT&T made to this court regarding the effect of the BPCA. Qwest's reliance on this case is unavailing. In *JMC Telecom*, the parties entered into a contractual arrangement for the resale of AT&T prepaid long-distance calling cards. When JMC failed to pay, AT&T sued. JMC claimed that AT&T breached the contract by failing to honor a contract addendum that required AT&T to lower rates should JMC suffer certain business losses. The Third Circuit disagreed, finding that the addendum was not filed with the FCC and, therefore, could not justify off-tariff rates.

Here, the BPCA does not set rates. Rather, the parties executed a settlement resolving the factual issue regarding retroactive application. Because the settlement at issue resolves payments pertaining to a period of time for which the applicability of different filed tariffs remains unresolved, the settlement does not impact the public policy behind the otherwise strict interpretation of the filed-rate doctrine.

Qwest therefore seeks to have this court invalidate its otherwise valid

settlement.  Having determined that the settlement at issue does not violate the filed-rate doctrine, we believe it is appropriate to address whether the district court correctly found that the February BPCA Supplement is an otherwise valid settlement of the dispute.  *See Yamaha Motor Corp. U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) ("[T]he appellate court may address any issue fairly included within the certified order because it is the *order* that is appealable, and not the controlling question identified by the district court." (quotation omitted)).  After a thorough review of the record, we believe that it is.  Qwest, with full knowledge of its litigation options, executed that BPCA Supplement settling all past billing periods five days after it filed suit in this case, weeks after the FCC issued its order, and long after Qwest was aware of AT&T's actions, actions that Qwest itself committed prior to its merger with U S West.  Accordingly, we are convinced that Qwest validly and purposely released its claims in accordance with the terms of the BPCA.  This is especially so considering the parties' course of conduct.  In particular, we note that in June 2004, just after executing the February BPCA Supplement, Qwest submitted an Exemption Form for the March 2004 billing cycle that disputed whether IP telephony-related calls were subject to access charges.  This is a clear recognition of the BPCA's ongoing applicability and the need to specifically exempt the type of charges at issue here.  The fact that the dispute was settled within the BPCA framework is not surprising: the BPCA is

-13-

a settlement agreement, created with the express purpose of amicably and efficiently settling access-charge disputes.

Qwest's cries of mistake evoke no sympathy. As an initial matter, this issue was never raised below. *See Walker v. Mather*, 959 F.2d 894, 896 (10th Cir. 1992) (declining to address certain issues given general rule that appellate courts do not consider issues not raised before district court). Regardless, the record shows that the parties were engaged in "high-level" discussions concerning this issue in February 2004. (Appellant's App., vol. 1 at 141.) We consider it highly dubious that "low-level" staff—apparently ignorant of the highly contentious atmosphere—executed the BPCA by mistake just days after the lawsuit was filed. We are equally unpersuaded by Qwest's argument regarding bad faith and lack of consideration.

Thus, we **AFFIRM** the district court's grant of summary judgment on claims released by the February BPCA Supplement.