**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 27, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNION TELEPHONE COMPANY, a
Wyoming corporation,

     Plaintiff - Appellant,

v.

QWEST CORPORATION, a Colorado
corporation f/k/a U.S. West
Communications, Inc.,

     Defendant - Appellee.

No. 06-8012

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 02-CV-209-WFD)**

---

Bruce S. Asay, Associated Legal Group, LLC, Cheyenne, Wyoming, for Plaintiff
- Appellant.

Steven J. Perfrement, Holme, Roberts, & Owen LLP, Denver, Colorado (Roy E.
Hoffinger, Musgrave, & Theis, LLP, Denver, Colorado and Paul Hickey, Hickey
& Evans, LLP, Cheyenne, Wyoming with him on the briefs), for Defendant -
Appellee.

---

Before **LUCERO**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Union Telephone Company ("Union") brought suit against Qwest Corporation ("Qwest") seeking compensation for telecommunication services provided by Union to Qwest. The district court granted summary judgment in favor of Qwest, and Union now appeals. Because Union has failed to present a valid agreement or tariff that could serve as the basis for its claims for compensation, we **AFFIRM**.

## I

Union is a telecommunications company operating primarily in Wyoming, with some customers in Colorado and Utah. Its activities are subject to the Telecommunications Act of 1996 ("1996 Act"), 47 U.S.C. §§ 153, et seq., as a telecommunications carrier, and, more specifically, an incumbent local exchange carrier ("ILEC").[1] As an ILEC, it provides wireline local and long distance services[2] to approximately 7000 customers, 6300 of whom are located in

---

[1] A telecommunications carrier is defined as any provider of telecommunications services. 47 U.S.C. § 153(44). A local exchange carrier ("LEC") is a company that provides local telephone service in a particular geographic area. An ILEC is a LEC that was operating in a particular area on the date the 1996 Act took effect. § 251(h).

[2] Long distance service can refer either to interstate or "interLATA" service. InterLATA service is short-haul long distance service. Local Access and Transport Areas ("LATAs") were established to define the territory within which the new Regional Bell Operating Companies ("RBOCs") could offer long distance service following the 1982 settlement agreement divesting AT&T of its local service companies. Colorado is divided into two LATAs, while Wyoming and Utah each comprise a single LATA.

Wyoming. Union is also a wireless provider, servicing approximately 40,000 wireless subscribers, 30,000 of whom are located in Wyoming.

Qwest is a wireline telecommunications carrier and an ILEC, providing local and intraLATA service[3] in 14 western states, including Wyoming, Colorado, and Utah. Importantly for this appeal, it also provides "transit" services to other carriers in this region, meaning that other telecommunications companies may send calls over Qwest's network pursuant to agreements that must be approved by the appropriate state public utilities commission ("PUC"). When a Qwest customer places a call to a telephone user who subscribes to another LEC, such as Union, Qwest routes the call to that LEC's network for "termination," or completion. Some of the calls Qwest sends to Union are "originated," or placed, by Qwest customers, and some are originated by customers of other carriers and transited over the Qwest network.

Because this case concerns both wireless and wireline telephone calls, a brief summary of the regulatory framework is necessary. Wireless service has been largely deregulated at the state level but remains subject to FCC regulation. See 47 U.S.C. § 332(c). State PUCs regulate local and intrastate wireline traffic, and the FCC sets the rules for interstate wireline traffic. Both wireless and

---

[3] As an RBOC, Qwest was previously prohibited from providing interLATA service. See 47 U.S.C. § 271(a). However, in 2002 the Federal Communications Commission ("FCC") authorized it to provide interLATA service in Colorado, Utah, and Wyoming through a separate affiliate. See Qwest Commc'n Int'l, Inc., 17 F.C.C.R. 26,303, 26,305 (2002).

wireline calls may be either local or long distance.[4] Compensation for local calls that originate and terminate with different carriers is determined by reciprocal compensation agreements. Long distance calls, that is, calls crossing from one calling area into another, incur a toll, and the originating carrier must compensate the terminating carrier for terminating the call.[5] For wireline services, this toll is called a terminating access charge, and rates are based on filed tariffs. Significantly, these tariffs apply only to long distance service. For toll calls traveling between local calling areas within the same state, or intrastate traffic, state PUCS must approve a LEC's proposed tariff. By contrast, interstate long distance service is subject to FCC regulation.

Union and Qwest share a contentious history, having litigated various aspects of their relationship for over a decade. This litigation involves a complaint filed by Union in 2000 with the Wyoming Public Services Commission against U.S. West Communications, Inc. ("U.S. West"), Qwest's predecessor. Union claimed that the interconnection technology U.S. West used to send traffic

---

[4] For wireless traffic, local calling areas are defined by the Major Trading Areas ("MTAs"). Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15,499, 16,014 (1996) (First Report and Order) [hereinafter "Local Competition Order"]. Thus all intraMTA calls are local calls. Most of Colorado and Wyoming are in the same MTA.

[5] This principle is known as "calling party pays." Interexchange carriers such as AT&T or Sprint may also carry traffic from one LATA to another. In that case, the interexchange carrier is responsible for paying both the originating LEC and the terminating LEC for the use of their networks.

to Union's network did not allow Union to identify and properly bill the originating carrier. Union also claimed that U.S. West refused to compensate it for toll traffic sent to its network, despite the existence of allegedly applicable Union tariffs, and on these claims requested an order from the Commission, directing U.S. West to pay terminating access charges for all toll traffic routed to Union by U.S. West, regardless of which carrier originated the call.

U.S. West merged with Qwest, and thereafter both Union and Qwest submitted pre-filed testimony and presented witnesses at an evidentiary hearing before the Commission. Most of the testimony related to the interconnection technologies Qwest used to deliver toll traffic. However, the commissioners also inquired into Union's claim that Qwest was responsible for paying terminating access fees for all Qwest to Union traffic, regardless of where the call originated. On January 24, 2001, the Commission issued an order dismissing the vast majority of Union's claims. It found that "Union [had] cited no authority that the 'filed rate doctrine' applies to this case" with respect to Qwest's alleged duty to pay termination fees at Union's tariff rates.

Rather than seek reconsideration or judicial review of the Commission's decision, Union filed a complaint in federal court, asserting four claims against Qwest: (1) breach of tariff, (2) breach of contract, (3) discrimination by a common carrier, and (4) quantum meruit or unjust enrichment. These claims relate to two main categories of calls: (1) wireless traffic originated by Qwest

and transported or terminated by Union in Wyoming, Colorado, and Utah, and (2) wireline, intrastate, long distance traffic transiting Qwest's network, originated by a third party and sent through Qwest's network for termination by Union in Wyoming, Colorado, and Utah. Wireless calls make up the bulk of the traffic at issue. The district court granted Qwest's motion for summary judgment, dismissing all of Union's claims except for the breach of tariff and contract claims with respect to wireline traffic terminating in Colorado and Utah.[6]

Union now appeals the district court's grant of summary judgment.

## II

We review a district court's grant of summary judgment de novo, "applying the same legal standard used by the district court." Harrison v. Wahatoyas, L.L.C., 253 F.3d 552, 557 (10th Cir. 2001). Summary judgment is only appropriate if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III

Union's breach of tariff and contract claims arise with respect to a number of distinct types of traffic. We consider first its wireless traffic claims, which consist of: intraMTA calls; interMTA, intrastate calls; and interMTA, interstate

---

[6] Union later moved to dismiss those remaining claims without prejudice, and the district court granted its motion.

calls. We then consider wireline calls, which on appeal are comprised solely of calls terminated in Wyoming.

## A

Pursuant to the 1996 Act, all LECs have a duty to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). Compensation for terminating intraMTA, or local, wireless calls is determined by rates in these interconnection agreements and not by access charges contained in filed tariffs. Local Competition Order, 11 F.C.C.R. at 16014. As the Local Competition Order makes clear, these federal regulations bar Union from applying tariff-based access charges to intraMTA wireless traffic. Despite this fact, Union argues that it may apply its state tariffs to intraMTA wireless traffic based on a 2005 FCC decision, Developing a Unified Intercarrier Compensation Regime, 20 F.C.C.R. 4855 (2005). In that decision, the FCC addressed traffic sent from a commercial mobile radio services ("CMRS") provider to an ILEC. See id. at 4862. In the present case, acting as an ILEC, Qwest routes calls to Union for wireless termination. In other words, this case considers ILEC to CMRS traffic, the opposite of the situation in Developing. This distinction is important, because until Developing an ILEC could not compel a CMRS provider to negotiate a reciprocal compensation agreement. See id. at 4863 n.54. Thus, tariffs were the only compensation mechanism for an ILEC terminating calls from an

uncooperative CMRS provider. Given that Union is now empowered to compel Qwest to negotiate an interconnection agreement under 47 U.S.C. § 252, it can neither avail itself of Developing's stop-gap tariff allowance, because its state tariffs are inapplicable to this type of traffic, nor demand, absent a negotiated agreement, compensation for intraMTA traffic under a theory of breach of contract.

Most traffic at issue in the case before us is intraMTA, but we also consider a small amount of interMTA traffic. Union has duly filed tariffs in Wyoming, Colorado, and Utah, listing its wireline terminating access charges, which it contends should apply to wireless traffic as well. Qwest argues that Union has failed to show either that the filed tariffs apply to wireless traffic or that Union has properly filed rates for wireless services.

Under the filed rate doctrine, "the rate of the carrier duly filed is the only lawful charge, and deviation from it is not permitted." Qwest Corp. v. AT&T Corp., 479 F.3d 1206, 1210 (10th Cir. 2007) (quotation and alteration omitted). Duly filed rates bind both carriers and customers with the force of law. Atchison, Topeka & Santa Fe Ry. Co. v. Bouziden, 307 F.2d 230, 234 (10th Cir. 1962). Rights and liabilities defined by the tariff "cannot be varied or enlarged by either contract or tort of the carrier." Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 227 (1998).

As previously noted, these parties share a long and litigious history, consequently, it is not entirely surprising that this issue has already been litigated. In U.S. West Communications, Inc. v. Wyoming Public Services Commission, the Wyoming Supreme Court held that "Union's cellular operations are distinct and separate from its landline operations." 907 P.2d 343, 348 (Wyo. 1995). Under Wyoming state law, "Union is required to file rates for its cellular operations." Id. Because Union failed to file such rates, the court held that "Union is . . . precluded from receiving terminating access charges for cellular calls until such tariffs are properly filed." Id. Union admits that it did not file separate tariffs for wireless services in Wyoming, thus it lacks an applicable tariff for terminating wireless traffic under Wyoming state law.

The district court stayed judgment with respect to wireless calls terminated in Colorado and Utah in order to give Union an opportunity to present evidence that these states regulate wireless traffic.[7] When Union failed to produce such evidence, the district court dismissed claims relating to those calls. Because Union does not present this court with either state law or regulation supporting its tariff claims in Colorado or Utah, we apply federal law to its remaining interMTA claims.

---

[7] In 1995, Wyoming passed a statute deregulating most aspects of wireless telecommunication in the state, Wyo. Stat. § 37-15-104(a)(vi), and the district court surmised that Colorado and Utah may have taken similar action.

Pursuant to the Communications Act of 1934 ("Communications Act"), carriers may form interconnection agreements to provide telecommunications services and set reasonable rates for such services. 47 U.S.C. § 201. Absent agreement, wireless providers may petition the FCC for an order requiring interconnection with another carrier; the carrier must then establish just and reasonable charges. § 332(c)(1)(B) (incorporating by reference § 201). Union does not allege that it has an agreement with Qwest governing interMTA traffic, nor has it petitioned the FCC for an order requiring compliance with § 201. Because Union relies solely on state tariffs to support its claims, it has no basis for its breach of tariff or contract claims under federal law. Thus, we conclude that the district court properly granted summary judgment to Qwest on Union's breach of tariff and contract claims.

**B**

In 2001, the Wyoming Public Services Commission dismissed a number of Union's claims against Qwest, including a claim for compensation for all wireline toll traffic transited or originated by Qwest. Based on that decision, the district court held that Union's breach of contract and breach of tariff claims with respect to intrastate wireline traffic in Wyoming were barred by collateral estoppel. Under Wyoming law, the doctrine of collateral estoppel applies to "final adjudicative determinations which have been rendered by administrative tribunals." Kahrs v. Bd. of Trs. for Platte County Sch. Dist. No. 1, 901 P.2d 404,

406 (Wyo. 1995). Courts must consider four factors in determining whether collateral estoppel bars relitigation of an issue:

> (1) whether the issue decided in the prior adjudication was identical with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

Id. Union argues that the first two factors have not been satisfied.

First, Union contends that the issues in the present case and in the case before the Commission are distinct. According to Union, its complaint before the Commission dealt with Union's attempts to properly identify the Qwest traffic terminated on its network, and did not address Qwest's obligation to pay for that traffic. Although much of the Commission complaint is devoted to identifying traffic, Union also argued that in the absence of proper identification, Qwest was responsible for paying access charges for all traffic coming from its network.[8] This claim for compensation was based on Qwest's obligations under Union's tariff filed with the Commission. James Woody, a member of Union's board of directors and its management team, reiterated this argument when he was questioned directly about it by the Commission. Woody later testified before the

_____

[8] As stated in its claim for relief, Union requested that the Commission order Qwest to "be responsible for the payment of terminating access charges for all toll traffic routed by [Qwest] to [Union] on [Qwest] toll trunks, regardless of the originating carrier."

district court that the breach of tariff and contract claims in the aforementioned complaint and the present claims are the same. In its order, the Commission found that Union failed to establish that the filed rate doctrine applied to its claim for compensation. Based on our careful review of the record and the Commission's order, we conclude that the tariff issues in the present case are identical to those raised and decided in the prior adjudication.

Second, Union claims that the Commission's order was not a judgment on the merits. Union contends that the Commission dismissed its claims without prejudice. It also argues that the Commission's decision could not have resulted in a judgment on the merits of the compensation claim because the Commission lacked authority to enter a monetary judgment for Union. Final decisions by administrative agencies like the Wyoming Public Services Commission can be judgments on the merits for the purposes of collateral estoppel. Id. at 406. A judgment that a party has failed to carry their burden of proof may preclude that party, under the doctrine of collateral estoppel, from attempting to prove the same issue in a later adjudication. Yates v. United States, 354 U.S. 298, 335-36 (1957) (reversed on other grounds). Collateral estoppel bars relitigation of issues previously decided; for preclusion of claims, the appropriate doctrine is res judicata. Pokorny v. Salas, 81 P.3d 171, 175 (Wyo. 2003). The Commission issued an order ruling directly on three service-related issues and dismissing the remaining claims. As to Union's claim for compensation, the Commission held

that Union failed to meet its burden of proof that the filed rate doctrine applied. It reached this conclusion after a review of all the evidence and a hearing, and nothing in the Commission's order indicates that it dismissed the claims without prejudice. Whether the Commission could have awarded monetary damages is immaterial to our determination of what issues it decided. Consequently, we conclude that the prior adjudication resulted in a judgment on the merits.

Because Union does not contest the remaining two factors, we hold that collateral estoppel bars Union's breach of contract and tariff claims.

**IV**

In addition, Union advances a discrimination claim. Under the Communications Act and corresponding state statutes, telecommunications carriers may not unreasonably discriminate in their practices, classifications, or "services for or in connection with like communication services." 47 U.S.C. § 202(a); see also Wyo. Stat. § 37-15-404(a). Courts apply a three-step analysis to claims for discrimination under § 202(a). Panatronic USA v. AT&T Corp., 287 F.3d 840, 844 (9th Cir. 2002) (summarizing holdings of the Second and D.C. Circuits). First, the plaintiff must prove that the services are "like." Id. Second, the plaintiff must show that the services are provided under different terms and conditions. Id. If the plaintiff satisfies the first two requirements, the burden shifts to the defendant to justify the difference as reasonable. Id.

Union claims that Qwest unlawfully discriminates against it by using different methods to calculate its payment obligations to Union than it does with other LECs. This claim is unusual, in that Union, a provider of terminating services, is complaining that Qwest, a customer, discriminates against it. However, the duties of a common carrier like Qwest under the Communications Act do not necessarily benefit only customers, they may privilege suppliers as well. See Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc., 127 S. Ct. 1513, 1524-25 (2007) (discussing § 201 of the Communications Act). For the purposes of this appeal, we assume, without deciding, that a plaintiff may bring a discrimination claim against a customer.

The "like" services in question are Qwest's payments for terminating calls originated or transported by Qwest to a LEC. Relying on the testimony of Qwest experts, Union asserts that Qwest participates in "residual billing" and a "clearinghouse method" of billing with carriers in certain other states. When utilizing residual billing, the terminating carrier bills originating carriers for all identified traffic transported from Qwest's network, and bills Qwest for any remaining unidentified traffic. According to Qwest's expert, only some carriers in Minnesota, Iowa, and North Dakota have attempted to use residual billing, and since 2000, Qwest has refused to participate in this method. Only in North Dakota does a LEC use residual billing, pursuant to a settlement agreement between it and Qwest. Under the clearinghouse method, all the carriers in the

state send a list of the interLATA toll calls they have originated or terminated to a central database. By searching this database, the central service can determine which carrier routed a call to a terminating LEC and assign proper terminating access charges. This method requires all carriers in a state to participate, and according to Qwest, it is only used in New Mexico, Oregon, and Washington.

Based on this testimony, the district court held that Union had met its burden with respect to the first two steps of the discrimination analysis, but had failed to show that the discrimination was unreasonable. Although the district court incorrectly placed the burden on Union to show unreasonableness, based on our independent review of the record, we conclude that any differences in billing practices are reasonable. See United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994) ("We are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court."). The evidence shows that several carriers have attempted to residually bill Qwest, and for several years, Qwest has rebuffed these efforts. Only one carrier continues to residually bill Qwest, and there only because the method is mandated by a settlement agreement. For the clearinghouse method, all local carriers in a state must agree to participate in such a program, and Qwest cannot implement this method without their cooperation. Nothing in the record indicates that carriers in Wyoming, Colorado, or Utah, including Union, have shown interest in instituting a clearinghouse billing system.

- 15 -

Thus Qwest's failure to use this method with Union can be explained by its unavailability in those states. Because Qwest has sustained its burden and no genuine issue of material fact remains with respect to the discrimination claim, summary judgment was properly granted to Qwest.

**V**

Finally, Union argues that in the absence of an applicable contract or tariff, it is entitled to termination fees under the equitable theory of unjust enrichment. Qwest's position is that federal law preempts this equitable claim. Section 251 of the 1996 Act requires LECs to establish reciprocal compensation agreements through private negotiation. 47 U.S.C. § 251(b)(5). Should parties fail to reach an agreement, § 252 allows a party to seek state intervention or compel arbitration. 47 U.S.C. § 252. Qwest argues that by creating these procedures in the 1996 Act, Congress clearly intended parties to negotiate rather than seek equitable remedies in court. Because Union refused to seek a reciprocal compensation agreement, Qwest contends, it cannot now seek compensation in equity.

Under Wyoming law, unjust enrichment, or quantum meruit, is an equitable doctrine that "implies a contract so that one party may recover damages from another." Bowles v. Sunrise Home Ctr., 847 P.2d 1002, 1004 (Wyo. 1993). In order to establish this claim, Union must prove that: (1) valuable services were rendered to Qwest; (2) these services were accepted, used, and enjoyed by Qwest;

(3) under circumstances which reasonably notified Qwest that Union expected to be paid; and (4) without such payment, Qwest would be unjustly enriched. Eisele v. Rice, 948 P.2d 1360, 1364 (Wyo. 1997). However, "an action for unjust enrichment will not lie where it would frustrate law or public policy, either directly or indirectly." Bowles, 847 P.2d at 1004. Colorado and Utah apply similar standards to claims of unjust enrichment. See, e.g., Salzman v. Bachrach, 996 P.2d 1263, 1265-66 (Colo. 2000); Desert Miriah, Inc. v. B & L Auto, Inc., 12 P.3d 580, 582 (Utah 2000).

The district court held that Union had "very ably stated a claim for unjust enrichment." Although it did not specifically address the issue of preemption, the district court went on to conclude that an equitable remedy was unavailable given that Union had failed to comply with applicable statutory and regulatory requirements.

We not only agree that Union has shown facts that might support each element of the unjust enrichment claim, but also agree that equitable relief is not appropriate under the circumstances. Because federal law requires parties such as Qwest and Union to set rates through interconnection agreements, 47 U.S.C. § 252, allowing Union to recover damages under a theory of unjust enrichment or quantum meruit would frustrate the federal regulatory mechanism. Union cites WorldCom, Inc. v. Graphnet, Inc., 343 F.3d 651, 657 (3d Cir. 2003), for the proposition that a party may seek compensation under a theory of unjust

enrichment or quantum meruit, even if it did not comply with statutory requirements. On considering that case, it does not appear to us that <u>WorldCom</u> is apt, given that those parties had actually negotiated and executed a contract as required by the Communications Act, and had merely neglected to file it with the FCC. <u>Id.</u> at 654-55. Addressing the issues and facts in the case before us, we hold that it is inappropriate to imply a contract in equity considering that under federal law Union had an obligation to contract directly with Qwest but chose not to do so.

## VI

The judgment of the district court is **AFFIRMED**. All pending motions are **DENIED**.