**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| CALLERID4U, INC., *Plaintiff-Appellant,* v. MCI COMMUNICATIONS SERVICES INC., DBA Verizon Business Services, *Defendant-Appellee.* | No. 15-35028 D.C. No. 2:14-cv-00654-TSZ |

| | |
|---|---|
| CALLERID4U, INC., *Plaintiff-Appellant,* v. BELLSOUTH LONG DISTANCE, INC., DBA AT&T Long Distance Service, *Defendant,* and AT&T CORP., *Defendant-Appellee.* | No. 15-35029 D.C. No. 2:14-cv-00700-TSZ OPINION |

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, Senior District Judge, Presiding

Argued and Submitted June 6, 2017
Seattle, Washington

Filed January 22, 2018

Before:  Ferdinand F. Fernandez, Consuelo M. Callahan,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

# SUMMARY[*]

## Communications Act

The panel affirmed the district court's dismissal of claims brought under Washington state law by CallerID4u, Inc., seeking compensation for telecommunications services it provided to AT&T Corp. and Verizon Business Services.

CallerID4u sought compensation for local telecommunications services it provided during a period when it had neither entered into a negotiated compensation agreement nor filed a valid tariff setting rates for the services with the Federal Communications Commission. The panel concluded that CallerID4u was subject to the tariff-filing requirements of Section 203 of the Communications Act because it did not have a negotiated agreement. Agreeing with the Tenth Circuit, the panel also concluded that, under the filed rate doctrine, CallerID4u's state law equitable claims for unjust enrichment and quantum meruit were preempted under Section 203. In addition, CallerID4u failed to state a claim under the Washington Consumer Protection Act.

## COUNSEL

Matthew Alexander Henry (argued), McCollough Henry PC, West Lake Hills, Texas, for Plaintiff-Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Joshua D. Branson (argued), Melanie L. Bostwick, and Scott H. Angstreich, Kellogg Huber Hansen Todd Evans & Figel PLLC, Washington, D.C.; Demetrios G. Metropoulos, Mayer Brown LLP, Chicago, Illinois; for Defendants-Appellees.

**OPINION**

IKUTA, Circuit Judge:

Under the Communications Act of 1934 and Federal Communications Commission (FCC) rules, CallerID4u was required to either file a valid tariff setting rates for local telecommunications services or enter into a negotiated agreement regarding compensation for services rendered. *See* 47 U.S.C. § 203; *see also Access Charge Reform*, 16 FCC Rcd. 9923, 9934 (2001) ("*Access Reform Order*"); 47 C.F.R. § 61.26. But CallerID4u had neither a tariff nor a contract in place during a six-month period in which it provided telecommunications services to AT&T and Verizon. When AT&T and Verizon refused to pay for these services, CallerID4u brought claims against them under Washington state law equitable principles for the value of services rendered. We conclude that CallerID4u was subject to the tariff-filing requirements of Section 203 of the Communications Act, 47 U.S.C. § 203, because it did not have a negotiated agreement. We also conclude that CallerID4u's state law equitable claims are preempted under Section 203 of the Communications Act. We therefore affirm the district court's dismissal of CallerID4u's claims.

I

In order to provide the context necessary to address CallerID4u's arguments, we begin by reviewing the relevant regulatory history and legal framework.

## A

The Communications Act of 1934 (the Communications Act), 47 U.S.C. §§ 151 et seq., gave the FCC "broad authority to regulate interstate telephone communications." *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 48 (2007). At the time the Communications Act was passed, AT&T and its subsidiaries "enjoyed a virtual monopoly over the nation's telephone service industry," *Ting v. AT&T*, 319 F.3d 1126, 1130 (9th Cir. 2003), which at that time consisted of wire communications (i.e., landlines). The Communications Act was intended in part "to address the unique problems inherent in a monopolistic environment." *Id.*

The wire communications provisions of the Communications Act "authorized the [FCC] to regulate the rates charged for communication services to ensure that they were reasonable and nondiscriminatory." *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 220 (1994). Section 201 of the Communications Act requires that "[a]ll charges, practices, classifications, and regulations for and in connection with [interstate wire] communication service[s], shall be just and reasonable." 47 U.S.C. § 201(b). If the FCC concludes that a common carrier's charges or practices are unjust or unreasonable, they will be "declared to be unlawful," *id.*, and the FCC may "determine and prescribe what will be the just and reasonable" charges and practices, *id.* § 205(a).

Section 203 of the Communications Act requires most common carriers engaged in the provision of telecommunications services to set the rates and terms of their interstate telecommunications services by filing schedules or "tariffs" with the FCC. *See* 47 U.S.C. § 203(a).[1] A common carrier's tariffs "are essentially offers to sell on specified terms, filed with the FCC and subject to modification or disapproval by it." *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th Cir. 1998). Section 203(c) prohibits common carriers from providing any interstate wire telecommunications services without filing tariffs with the FCC, and prohibits common carriers from charging, demanding, collecting, or receiving any compensation for such services except as specified in the carriers' filed tariffs. 47 U.S.C. § 203(c).[2]

---

[1] Section 203 applies to "common carriers, except connecting carriers." 47 U.S.C. § 203(a). "Common carrier" is defined as "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier." *Id.* § 153(11). "Connecting carrier" is defined, in relevant part, as "any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier." *Id.* §§ 152(b)(2), 153(12).

[2] 47 U.S.C. § 203(c) states in full:

> No carrier, unless otherwise provided by or under authority this chapter, shall engage or participate in [interstate or foreign wire or radio communication] unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall

B

It has long been established that the tariff requirement of § 203 preempts state law. Because § 203 was modeled after similar provisions of the Interstate Commerce Act (ICA), "and share[s] its goal of preventing unreasonable and discriminatory charges," the Supreme Court concluded that "the century-old 'filed rate doctrine' associated with the ICA tariff provisions applies to the Communications Act as well." *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998). As applied to state law, the filed rate doctrine "is a form of deference and preemption, which precludes interference with the rate setting authority of an administrative agency." *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225 (9th Cir. 2007). Under the doctrine, "the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext." *Cent. Office Tel.*, 524 U.S. at 222 (quoting *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915)). The doctrine "embodies the policy which has been adopted by Congress in the regulation of interstate [telecommunications services] in order to prevent unjust discrimination." *Id.* (quoting *Maxwell*, 237 U.S. at 97).

---

(1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.

When the filed rate doctrine applies, it generally precludes a regulated party from obtaining any compensation under other principles of federal or state law that is different than the filed rate. *See Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922). In *Keogh*, a manufacturer claimed it was entitled to damages under the Sherman Act caused by certain carriers that had conspired to set an unreasonably high filed rate. *Id.* at 160. The Court rejected this argument, reasoning that the rate approved by the Interstate Commerce Commission (ICC) was the legal rate and could not be "varied or enlarged by either contract or tort of the carrier." *Id.* at 163. "This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention [sic] of unjust discrimination—might be defeated." *Id.* The Court reasoned that if one manufacturer was able to recover for damages resulting from paying the filed rate, it effectively received a rate different than the filed rate, and would have a preference over its competitors. *Id.*

The Supreme Court later applied the doctrine to preclude state courts from awarding damages under state law, where doing so would interfere with the exclusive rate-setting authority of federal administrative agencies. "In this application, the doctrine is not a rule of administrative law designed to ensure that federal courts respect the decisions of federal administrative agencies, but a matter of enforcing the Supremacy Clause." *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 963 (1986). In *Arkansas Louisiana Gas Co. v. Hall*, for example, the Supreme Court overturned a state court's award of damages for breach of contract to federally regulated sellers of natural gas. 453 U.S. 571, 584 (1981). The sellers had filed rates with the Federal Energy Regulatory Commission (FERC), as required under federal law, but alleged that they were entitled to a higher rate under

a contract with their customer than the rate they had filed with FERC. *Id.* at 573–74. The state court agreed, and held that the sellers were entitled to damages for breach of contract, notwithstanding the tariff-filing requirements and the filed rate doctrine. *Id.* at 575. The state court reasoned that if the sellers had filed rate increases with FERC based on their negotiated contracts, the rate increases would have been approved. *Id.* The Supreme Court reversed, explaining that, in order to award damages, the state court had to "speculat[e] about what the Commission might have done had it been faced with the facts of this case." *Id.* at 578–79. Such an approach, the Court concluded, "would undermine the congressional scheme of uniform rate regulation" by allowing "a state court to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the Act." *Id.* at 579. Because "under the filed rate doctrine, the Commission alone [was] empowered to make that judgment," the Supreme Court concluded that the state court had "usurped a function that Congress has assigned to a federal regulatory body," in violation of the Supremacy Clause. *Id.* at 582.

The Supreme Court has consistently applied the filed rate doctrine to preclude the award of any rate other than the filed rate, even where doing so has resulted in harsh consequences. In *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, for example, the Supreme Court considered whether the bankruptcy trustee for a motor common carrier could collect undercharges for the difference between the rate the motor common carrier had negotiated with a shipper and the higher rate the motor common carrier had filed with the ICC. 497 U.S. 116, 122–23 (1990). The Supreme Court held that the trustee could collect undercharges because the filed rate alone governed the legal relationship between the carrier and

the shipper. The Court explained that "[i]n order to render rates definite and certain, and to prevent discrimination and other abuses, the statute require[s] the filing and publishing of tariffs specifying the rates adopted by the carrier, and ma[kes] these the *legal* rates, that is, those which must be charged to all shippers alike." *Id.* at 126 (alterations in original) (emphasis in original) (quoting *Az. Grocery Co. v. Atchison, T. & S.F. Ry. Co.*, 284 U.S. 370, 384 (1932)). Strict adherence to the filed rate doctrine was necessary to prevent carriers from "misquoting" rates, as a means of charging different rates to different customers. *Id.* at 127. The Supreme Court rejected the shipper's argument that awarding the filed rate rather than the negotiated rate would give the carrier a windfall, explaining that federal law "*requires* the carrier to collect the filed rate." *Id.* at 131 (emphasis in the original). Allowing the collection of any other rate would "sanction[] adherence to unfiled rates," thereby "undermin[ing] the basic structure of the Act." *Id.* at 132.

In short, § 203 and the accompanying filed rate doctrine preempts state law claims that conflict with the rate-setting authority of the FCC. Courts have applied the filed rate doctrine strictly in order to ensure that Congress's goal of uniformity and reasonableness in rates, "which lies at 'the heart of the common-carrier section of the Communications Act,'" is not undermined. *Cent. Office Tel.*, 524 U.S. at 223 (quoting *MCI Telecomms.*, 512 U.S. at 229).

C

We now turn to the history of the regulation of common carriers engaged in the provision of telecommunications services. Until the 1970s, AT&T and its subsidiaries maintained a virtual monopoly over interstate wire telephone

services, including both long distance and local wire telephone services. *See MCI Telecomms. Corp.*, 512 U.S. at 220. AT&T provided long-distance services to consumers, while the Bell Operating Companies, twenty-two local telephone companies wholly owned by AT&T, provided local services to consumers. *See Access Charge Reform*, 12 FCC Rcd. 15982, 15990–91 (1997) ("*Access Charge Reform Price Cap Order*"); *see also California v. FCC*, 905 F.2d 1217, 1225 (9th Cir. 1990). In the rubric of the wire telecommunications industry, AT&T and other long-distance providers are referred to as interexchange carriers, or IXCs, and the Bell Operating Companies and other local telephone companies are referred to as local exchange carriers, or LECs.

The LECs provide what is referred to as "switched access service[s]" to IXCs. *AT&T Corp. v. Alpine Commc'ns, LLC*, 27 FCC Rcd. 11511, 11512 (2012). When a caller makes a long-distance call on a landline, the call is initiated on the local telephone lines of the LEC that provides local telephone services to the caller. *Id.* The LEC then switches the call to that caller's IXC's long-distance telephone lines. *See id*. The initiating LEC charges the IXC for this service. *Id.* The IXC then carries the call to the LEC that provides local telephone services to the recipient of the call, and switches the call to that LEC's local telephone lines. *See id.* The terminating LEC then terminates the call at the recipient's phone. *Id.* The terminating LEC also charges the caller's IXC for this service. *Id.* The caller and the call recipient choose their LECs and pay the LECs' charges for local telephone services, but they do not pay the LECs' switched access service charges; rather, the IXC pays those charges. *See Access Reform Order*, 16 FCC Rcd. at 9935. Therefore, LECs are "insulated from the effects of competition," because the caller and call recipient who choose their LECs (but do not pay for

switched access services) have "no incentive to select a [LEC] with low rates." *Id.*

Beginning in the 1970s, new IXCs began entering the long-distance market to compete with AT&T. But because AT&T controlled the Bell Operating Companies, AT&T could freeze out competition by having its LECs charge higher prices to competing IXCs. *See Access Charge Reform Price Cap Order*, 12 FCC Rcd. at 15991. The federal government challenged these activities in an antitrust lawsuit against AT&T, which resulted in AT&T agreeing to divest itself of all twenty-two Bell Operating Companies. *Id.* The former Bell LECs are known as Incumbent LECs, or ILECs. *Id.*

Although the divestiture ended AT&T's anticompetitive control over the ILECs, the ILECs themselves had few competitors, and could use their local monopoly power to charge the IXCs unreasonable and discriminatory rates. *See id.* To avoid this problem, the FCC began regulating LECs' switched access service rates and required all LECs to file tariffs setting their rates.[3] *See, e.g.*, *MTS & WATS Mkt.*

---

[3] The source of the FCC's authority to require LECs to file tariffs is not entirely clear. *See Access Reform Order*, 16 FCC Rcd. at 9956 n.160. In *Lincoln Telephone & Telegraph Co. v. FCC*, 659 F.2d 1092, 1107–09 (D.C. Cir. 1981), the D.C. Circuit questioned whether LECs were "connecting carriers," which are exempt from § 203, but indicated that the FCC could nonetheless have authority under other provisions of the Communications Act, such as 47 U.S.C. § 154(i), which gives the FCC authority to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." More recently, the FCC has interpreted its authority as coming from § 203, *see AT&T Corp. v. All Am. Tel. Co.*, 28 FCC Rcd. 3477, 3494 (2013) ("*All American II*"), and courts have assumed the same, *see All Am. Tel. Co., Inc. v. FCC*, 867 F.3d 81, 84

*Structure*, 93 F.C.C.2d 241, 246 (1983); *see also Access Charge Reform Price Cap Order*, 12 FCC Rcd. at 15991–92.

In the early 1980s, in light of increased competition, the FCC began experimenting with deregulation of those IXCs and LECs deemed to be nondominant. *See MCI Telecomms. Corp.*, 512 U.S. at 221. A "dominant carrier" is a carrier that the FCC has found "to have market power (i.e., power to control prices)," and a "non-dominant carrier" is a carrier "not found to be dominant." 47 C.F.R. § 61.3(q), (z). The FCC distinguished between the ILECs (the former Bell Operating Companies which had market power and were found to be dominant) and the new LECs, which were deemed nondominant. *See Tariff Filing Requirements for Nondominant Common Carriers*, 8 FCC Rcd. 1395, 1397 (1993) ("*Nondominant Common Carriers Order*"). While ILECs still had to file tariffs, the FCC determined that because nondominant carriers (such as the new LECs) lacked market power, their customers would "simply move to other carriers" if they charged unjust and unreasonable rates. *Id.* at 1396. Accordingly, the FCC adopted "permissive detariffing," *id.*, meaning that the new LECs could avoid filing tariffs if they instead negotiated agreements with the IXCs for switched access services, *id.* at 1399 (stating that for ten years, the FCC permitted nondominant carriers "to refrain from filing tariffs under our permissive detariffing policy"); *see also In the Matter of Policy & Rules Concerning Rates for Competitive Common Carrier Servs. & Facilities Authorizations Therefor*, 84 F.C.C.2d 445, 484 (1981) (concluding that "neither statutory nor judicial authority prohibit[ed] the substitution of tariffs with contracts.").

(D.C. Cir. 2017). The parties here do not dispute that LECs are subject to the requirements of § 203.

Several years after instituting its permissive detariffing policy, the FCC took a further step by completely prohibiting nondominant carriers, including new LECs, from filing tariffs of any sort. *See Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor*, 99 F.C.C.2d 1020, 1021–22 (1985), *vacated by MCI Telecomms. Corp. v. F.C.C.*, 765 F.2d 1186, 1195 (D.C. Cir. 1985). This policy was referred to as "mandatory detariffing." *Id.* at 1024 n.13.

In 1994, the Supreme Court struck down the FCC's experiments in detariffing, concluding that § 203 of the Communications Act "establishes a rate-regulation, filed-tariff system for common-carrier communications, and the [FCC's] desire 'to "increase competition" cannot provide [it] authority to alter the well-established statutory filed rate requirements.'" *MCI Telecomms. Corp.*, 512 U.S. at 234 (second alteration in original) (quoting *Maislin*, 497 U.S. at 135). "[S]uch considerations address themselves to Congress, not to the courts." *Id.* (quoting *Armour Packing Co. v. United States*, 209 U.S. 56 (1908)).

In response to the Supreme Court's ruling, Congress passed the Telecommunications Act of 1996 (the 1996 Act), Pub. L. No. 104-104, 110 Stat. 56, which gave the FCC the authority to forbear from enforcing § 203's tariff-filing requirements if the FCC determined that (1) enforcement was not necessary to ensure that the common carriers' charges were just and reasonable, (2) enforcement was not necessary to ensure that consumers were protected, and (3) forbearance was "consistent with the public interest." 47 U.S.C.

§ 160(a).**[4]**  The 1996 Act also required ILECs to share their switched access networks with the new LECs (now referred to as Competitive LECs or CLECs) in order to facilitate greater competition among LECs.  47 U.S.C. §§ 251(b)–(c), 253(a); *see* 47 C.F.R. § 61.26(a)(1).

### D

After the 1996 Act took effect, the FCC promptly began exercising its new forbearance authority.  As a first step, it imposed mandatory detariffing on all non-dominant IXCs (i.e., IXCs other than AT&T) and prohibited them from filing tariffs.  *See Policy and Rules Concerning the Interstate,*

---

**[4]** 47 U.S.C. § 160(a) provides:

Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that –

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.

*Interexchange Marketplace*, 11 FCC Rcd. 20730, 20732–33 (1996) ("*IXC Detariffing Order*"). In other words, the FCC "chose to replace the rate filing mechanism with a market-based mechanism," for all nondominant IXCs, creating a "deregulated and competitive marketplace." *Ting*, 319 F.3d at 1141. In its rulings regarding the complete detariffing of IXCs, the FCC stated that because IXCs would be completely detariffed "consumers will be able to take advantage of remedies provided by state consumer protection laws and contract law against abusive practices." *IXC Detariffing Order*, 11 FCC Rcd. at 20733. The FCC reiterated this view following its complete detariffing of nondominant IXCs, stating that "consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime." *Policy and Rules Concerning the Interstate, Interexchange Marketplace*, 12 FCC Rcd. 15014, 15057 (1997).

We subsequently agreed with the FCC's analysis. *See Ting*, 319 F.3d at 1146. In *Ting*, we considered whether federal law preempted state common remedies in the context of a completely detariffed and competitive marketplace. We noted that "[u]nlike rate filing, this market-based method depends in part on state law for the protection of consumers in the deregulated and competitive marketplace." *Id*. at 1141. In the absence of a federal rate-filing requirement, state law action would no longer "interfere[] with Congress' chosen method of rate filing." *Id.* at 1143. We concluded that in an environment where tariffs do not apply, "we find no reason to imply a conflict between otherwise compl[e]mentary state and federal laws." *Id*. Accordingly, we concluded that § 203 and the filed rate doctrine, which "rested entirely on the filing requirement" of § 203, did not apply and that other provisions

of the Communications Act did not preempt state law claims regarding the rates charged by completely detariffed IXCs. *Id.* at 1142, 1146.[5]

E

The FCC next considered whether and how to deregulate the CLECs. Although CLECs were required to file tariffs setting the rates of their interstate switched access services, the FCC had decided that it did not need to modify or regulate the rates the CLECs were charging at the time, though the FCC "would be sensitive to indications that the terminating access rates of CLECs are unreasonable, and would revisit the issue if necessary." *Hyperion Telecomms., Inc. Petition Requesting Forbearance*, 12 FCC Rcd. 8596, 8601 (1997) ("*Hyperion Order*"). ILECs, by contrast, were both required to file tariffs and were also subject to FCC rate regulations. *See id.*

The FCC declined to impose mandatory detariffing on CLECs. Instead, it instituted a permissive detariffing regime for CLECs, making CLECs subject to the tariff-filing requirement in § 203 unless they entered into negotiated agreements with IXCs. *See id.* at 8608. CLECs that filed tariffs were not subjected to limitations on the amount they could charge, and they could choose freely between filing a tariff and negotiating an agreement. The FCC reasoned that it could forbear from requiring CLECs to file tariffs if they

---

[5] There is a circuit split on the question whether the Communications Act preempts state law claims in a completely detariffed environment. *See, e.g.*, *Dreamscape Design, Inc. v. Affinity Network, Inc.*, 414 F.3d 665, 674 (7th Cir. 2005); *Boomer v. AT&T Corp.*, 309 F.3d 404, 424 (7th Cir. 2002).

entered into negotiated agreements because under those circumstances: (1) tariffs were not necessary to ensure that CLECs' switched access rates were just and reasonable; (2) tariffs were not necessary to ensure that consumers were protected, and (3) permissive detariffing was "consistent with the public interest." *See id.* at 8608–12; *see also* 47 U.S.C. § 160(a).

After several years of experience with this new permissive detariffing policy, the FCC determined that some CLECs were taking advantage of the system by filing tariffs setting unreasonably high switched access rates that were "subject neither to negotiation nor to regulation designed to ensure their reasonableness." *Access Reform Order*, 16 FCC Rcd. at 9924–25. Because callers and call recipients were able to choose their own LECs to initiate and terminate their calls, the IXCs had to pay whatever rate was set by the CLECs in their tariffs in order to provide phone service to their customers. The CLECs could therefore impose rates far higher than the ILECs' rates (which were regulated by the FCC) with no risk that these high rates would drive away their individual customers. *See Developing a Unified Intercarrier Comp. Regime*, 16 FCC Rcd. 9610, 9657–58 (2001). The CLECs would then rely "on their tariff to demand payment from IXCs for access services that the [IXCs] likely would have declined to purchase at the tariffed rate." *Access Reform Order*, 16 FCC Rcd. at 9925.

In response to this regulatory arbitrage opportunity, the FCC issued the *Access Reform Order* in 2001, revising its CLEC tariffing system and conducting a new forbearance analysis. *Id.* In this order, the FCC revisited its reasoning in two of its earlier orders. First, the FCC set aside its decision in the *Access Charge Reform Price Cap Order* not to regulate

the switched access rates charged by CLECs. Instead, the FCC established a "benchmark" level for CLEC rates based on the rates charged by the ILEC or ILECs operating in a CLEC's service area. *Id.* at 9938, 9941. CLECs' tariffed rates would be "presumed to be just and reasonable" so long as they did not exceed the benchmark rate. *Id.* at 9938.

Second, the FCC revised its decision in the *Hyperion Order*. Rather than give CLECs free rein to choose whether to file tariffs, the FCC decided to exercise its forbearance authority "only for those CLEC interstate access services for which the aggregate charges exceed our benchmark" by requiring CLECs that sought to charge rates above the benchmark to negotiate agreements with IXCs. *Id.* at 9957. As a result of the *Access Reform Order*, there are "two means by which a CLEC can provide an IXC with, and charge for, interstate access services." *AT&T Servs. Inc. v. Great Lakes Comnet. Inc.*, 30 FCC Rcd. 2586, 2588 (2015). "First, a CLEC may tariff interstate access charges if its rates are no higher than the rates charged for such services by the competing ILEC." *Id.* "Second, as an alternative to tariffing, a CLEC may negotiate and enter into an agreement with an IXC to charge rates higher than those permitted under the benchmark rule." *Id.* at 2589. Under this new regime, CLECs could charge rates exceeding the benchmark only if the market conditions so allowed.

The FCC applied its 2001 *Access Reform Order* in two adjudicatory decisions which further clarified the scope of the FCC's order. *See AT&T Corp. v. All Am. Tel. Co.*, 28 FCC Rcd. 3477 (2013) ("*All American II*"); *AT&T Corp. v. All Am. Tel. Co.*, 30 FCC Rcd. 8958 (2015) ("*All American II Damages*"), *rev'd in part*, *All Am. Tel. Co., Inc. v. FCC*, 867 F.3d 81, 84 (D.C. Cir. 2017). In *All American II*, AT&T

filed a formal complaint with the FCC against CLECs, alleging that they had violated § 203 and § 201(b) of the Communications Act by billing AT&T for switched access services without valid and applicable interstate tariffs or a negotiated agreement.  28 FCC Rcd. at 3477, 3492–93. AT&T also alleged that the CLECs were engaged in the practice of "access stimulation," which made their charges unjust and unreasonable under § 201(b).[6]  *Id*. at 3477, 3480–84.  The FCC agreed with AT&T, holding that the CLECs had engaged in access stimulation and had violated § 203 and § 201(b) by billing AT&T for access services that were not set forth in a "valid and applicable" tariff or a negotiated agreement.  *Id.* at 3492.  The FCC reiterated that under the *Access Reform Order*, "until a CLEC files valid interstate tariffs under Section 203 of the [Communications] Act or enters into contracts with IXCs for the access services it intends to provide, it lacks authority to bill for those services."  *Id.* at 3494 (footnote omitted).

The FCC repeated this rule at the damages phase of the *All American II* proceedings.  The CLECs argued that AT&T had received "in excess of $11 million worth of terminating switched access" services and therefore would be unjustly enriched if it could also collect damages from the CLECs.  *All American II Damages*, 30 FCC Rcd. at 8962, 8962 n.48

---

[6] "Access stimulation" is a practice in which CLECs enter into agreements with providers of high call volume operations, such as chat line operators, to increase the volume of switched access services that they provide to IXCs. *See All American II*, 28 FCC Rcd. at 3480–84; *see also* 47 C.F.R. § 61.3(bbb).  By artificially increasing call volume, CLECs can collect extra revenue without raising their rates and violating the FCC's benchmark rule. *All American II*, 28 FCC Rcd. at 3480–84.  The FCC has issued a regulation strictly limiting the rates that can be charged by a CLEC engaged in access stimulation.  47 C.F.R. § 61.26(g).

(internal quotation marks omitted).  The FCC rejected this assertion, holding that because the CLECs were "entitled to compensation for access services only through a valid tariff or a contract negotiated with AT&T," *id.* at 8963 n.50 (internal quotation marks omitted), neither of which was applicable in that case, the CLECs could not "seek equitable relief relating to matters subject to regulation," *id.* at 8963. On appeal of this ruling, the D.C. Circuit concluded that the FCC "lacked the legal authority to discuss the merits of their state-law *quantum meruit* claims" because "Congress has vested the [FCC] only with the authority to address allegations of actions taken 'in contravention of' the Communications Act," and a "state common law claim, by definition, does not arise under or state a violation of the Communications Act[.]"  *All Am. Tel. Co., Inc. v. FCC*, 867 F.3d 81, 94 (D.C. Cir. 2017) (quoting 47 U.S.C. § 208(a)).  Accordingly, the D.C. Circuit held that the "merits of the [CLECs'] state-law claims must be decided by the district court in the first instance," and vacated the portion of the FCC's *All American II Damages* order that held that CLECs could not seek equitable relief under state law relating to matters subject to regulation.  *Id.* at 95.

In sum, under the current FCC orders, CLECs are subject to § 203 of the Communications Act's tariff-filing requirements and must file tariffs with rates at or below the benchmark, unless they negotiate an agreement with an IXC. *See Access Reform Order*, 16 FCC Rcd. at 9956–57.  If a CLEC does not file a tariff, and does not negotiate an agreement with an IXC, it lacks authority under the Communications Act to bill for those services.  *See All American II*, 28 FCC Rcd. at 3493–94; *see also All Am. Tel. Co., Inc.*, 867 F.3d at 84–85.  Although the FCC has expressed its views that CLECs could not "seek equitable

relief relating to matters subject to regulation" under state law, *All American II Damages*, 30 FCC Rcd. at 8963, following the D.C. Circuit's decision in *All American Telephone Co.*, this issue remains open.

## II

We now turn to the facts of this case. CallerID4u is a CLEC that provided specialized local telephone services to telemarketing companies.[7] When individuals phoned in long-distance "do not call" requests[8] to CallerID4u's telemarketing customers, CallerID4u picked up the calls from the individuals' IXCs and delivered the calls to the telemarketing companies. Beginning in April 2012, CallerID4u provided this switched access service for multiple long-distance "do not call" requests that were carried by AT&T and Verizon. CallerID4u did not negotiate an agreement with these IXCs and did not have a filed tariff in effect until September 28, 2012.

In April 2014, CallerID4u filed complaints against AT&T and Verizon in Washington state court, alleging that it was entitled to compensation at the rate set in its federal tariff for the periods both before and after its tariff went into effect on September 28, 2012. In the alternative, CallerID4u claimed that it was entitled to quantum meruit and unjust enrichment damages pursuant to Washington law, as well as to damages

---

[7] While this appeal was pending, CallerID4u ceased operations as a CLEC and no longer provides switched access services.

[8] *See* 47 C.F.R. § 64.1200(d)(3) ("Persons or entities making calls for telemarketing purposes . . . must honor a residential subscriber's do-not-call request within a reasonable time . . . .").

for unfair and deceptive practices in violation of the Washington Consumer Protection Act (WCPA), Wash. Rev. Code §§ 19.86.010–19.86.920,[9] again for the periods both before and after its tariff went into effect.[10]

After removing the cases to federal court, AT&T and Verizon filed separate motions to dismiss. *See* Fed. R. Civ. Proc. 12(b)(6). In November 2014, the district court dismissed with prejudice CallerID4u's federal tariff claims for the period before CallerID4u's tariff went into effect. It also dismissed with prejudice all of CallerID4u's alternative state law claims as barred by § 203 of the Communications Act and the filed rate doctrine. The district court dismissed CallerID4u's WCPA claims on the additional ground that they were barred by an express statutory exemption. *See* Wash. Rev. Code § 19.86.170.[11] Although the district court did not dismiss CallerID4u's tariff claims for the period after

---

[9] The WCPA provides: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Wash. Rev. Code § 19.86.020.

[10] CallerID4u also claimed conversion, breach of contract, and constructive trust, but waived these claims on appeal.

[11] Section 19.86.170 of the Revised Code of Washington states in pertinent part that:

> Nothing in this chapter shall apply to actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state, the Washington utilities and transportation commission, the federal power commission or actions or transactions permitted by any other regulatory body or officer acting under statutory authority of this state or the United States.

the tariff went into effect, CallerID4u voluntarily dismissed these claims with prejudice in December 2014.

The district court thereafter entered judgment in favor of AT&T and Verizon. CallerID4u timely filed this consolidated appeal, challenging only the dismissal of its alternative state law claims.

III

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's grant of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure de novo. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1040 (9th Cir. 2011). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570 (2007)).

When considering whether a federal statute preempts state law, we may look to the pronouncements of the federal agency that administers the statute for guidance. *See Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009). "While agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

We are limited in evaluating the FCC's construction of the Communications Act by the Hobbs Act, 28 U.S.C. § 2342, which "requires that all challenges to the validity of final orders of the FCC be brought by original petition in a court of appeals." *Pac. Bell Tel. Co. v. Cal. Pub. Utils. Comm'n*, 621 F.3d 836, 843 n.10 (9th Cir. 2010). Because this case was not initiated through such a petition, we must presume the validity of FCC regulations, rules, and orders that are currently in effect. *Id.* at 843.

IV

On appeal, CallerID4u argues that the district court erred in dismissing its state law claims of quantum meruit and unjust enrichment. According to CallerID4u, it provided detariffed services to AT&T and Verizon and therefore can obtain compensation under state law principles even in the absence of a valid tariff or negotiated agreement.

A

We first consider CallerID4u's contention that it is permissively detariffed under the *Hyperion Order*, and therefore not subject to the requirement in the *Access Reform Order* that it negotiate an agreement or file a tariff under § 203. CallerID4u's arguments proceeds in several steps. First, CallerID4u contends that the *Access Reform Order* did not overrule the *Hyperion Order*, and that a CLEC therefore need not negotiate an agreement or file a tariff under § 203, so long as it does not charge rates above the benchmark rate because it is permissively detariffed. Next, CallerID4u argues that it complied with the *Hyperion Order*, because it did not charge rates above the benchmark rate, but rather intended to charge rates at or below the benchmark (as

demonstrated by its September 28, 2012 tariff). Finally, CallerID4u contends that because it was permissively detariffed under the *Hyperion Order*, it can bring claims of quantum meruit and unjust enrichment against its customers, despite its failure to negotiate an agreement or file a tariff.

This argument errs at the threshold, because the FCC's *Access Reform Order* revised the *Hyperion Order* by requiring CLECs to file tariffs at or below the benchmark rate unless they entered into a negotiated agreement with an IXC. *Access Reform Order*, 16 FCC Rcd. at 9925. The FCC has repeatedly reaffirmed that under the *Access Reform Order*, a CLEC must file a tariff pursuant to § 203 to collect switched access services unless it has a negotiated agreement with its customer. *See, e.g.*, *Great Lakes*, 30 FCC Rcd. at 2588 (stating that there are "two means by which a CLEC can provide an IXC with, and charge for, interstate access services," either by tariffing its access charges at or below the benchmark rate or by negotiating and entering into an agreement with an IXC); *All American II*, 28 FCC Rcd. at 3480 (similar). Therefore, "until a CLEC files valid interstate tariffs under Section 203 of the Act or enters into contracts with IXCs for the access services it intends to provide, it lacks authority to bill for those services" under federal law. *All American II*, 28 FCC Rcd. at 3494 (footnote omitted). Because CallerID4u did not negotiate any agreements with IXCs, it remains subject to § 203's tariff-filing requirements. *See id.* at 3493–94; *see also Great Lakes*, 30 FCC Rcd. at 2588. We therefore reject CallerID4u's contention that it was not required under federal law to file a tariff or negotiate an agreement in order to bill for switched access services.

B

We next consider CallerID4u's argument that it is entitled to recover state common law remedies because it is operating in a detariffed regime in which the filed rate doctrine is no longer applicable. In making this argument, CallerID4u relies on our decision in *Ting*, in which we held that § 203 and the filed rate doctrine did not preempt state law claims made by the completely detariffed IXCs. *Ting*, 319 F.3d at 1146.

We reject this argument because CallerID4u misunderstands the nature of the environment in which it is operating pursuant to the FCC's *Access Reform Order*. As explained above, a CLEC remains subject to § 203 and the filed rate doctrine unless it negotiates an agreement. *See Great Lakes*, 30 FCC Rcd. at 2588; *All American II*, 28 FCC Rcd. at 3493–94. Under the *Access Reform Order*, a CLEC that elects to negotiate such an agreement with an IXC is not subject to the federal rate-filing requirement as to that agreement. For the reasons explained in *Ting*, where a CLEC has entered into the marketplace by negotiating a competitive agreement, a state law action to recover equitable remedies would not "interfere[] with Congress' chosen method of rate filing." *Ting*, 319 F.3d at 1143. But unless and until a CLEC has avoided the tariff filing requirement by entering into such an agreement, § 203 and the filed rate doctrine apply.

CallerID4u argues that because the FCC has established a permissive detariffing environment, it should not be precluded from bringing a state law action against the IXCs in cases where it neglected to file a tariff. We disagree. Allowing carriers to seek compensation through state law equitable principles would interfere with Congress's goals whether or not the carrier neglected to file a tariff. First,

CLECs that do not negotiate contracts are subject to § 203 and the FCC's requirement that they file tariffs charging no more than the benchmark rate. If CLECs that failed to negotiate a contract could bring legal actions under state law, CLECs could receive different rates either because different state equitable principles applied or because different courts weighed the equities differently, thus defeating Congress's uniformity goals. As the Supreme Court reasoned in *Keogh*, in order to uphold Congress's purpose to ensure uniform treatment of carriers, the legal rate should not be "varied or enlarged by either contract or tort of the carrier." *Keogh*, 260 U.S. at 163.

CallerID4u argues that awarding damages under state law would not interfere with the FCC's exclusive rate-setting authority here because the FCC already concluded in the *Access Reform Order* that rates at or below the benchmark will be presumed just and reasonable, and a state court could award that benchmark amount. CallerID4u's argument is unavailing. The benchmark serves as a cap, but does not represent the reasonable rate in all circumstances. For CLECs engaged in access stimulation, for example, the FCC has deemed the benchmark rate to be unreasonably high, and has strictly limited the rates that these CLECs can charge. *See* 47 C.F.R. § 61.26(g). Moreover, the damages that a court would award depends on state law equitable principles, which may result in a rate other than the benchmark rate. By applying state law equitable principles to determine the reasonable rate, a court would usurp "a function that Congress has assigned to a federal regulatory body." *Ark. La. Gas Co.*, 453 U.S. at 581.

In *Marcus v. AT&T Corp.*, the Second Circuit considered a similar argument. There, the appellants argued that

allowing a court to award damages despite the filed rate doctrine "would not amount to judicial rate-making" because appellants sought damages in an amount that the FCC had already determined was reasonable in approving a competitor's tariff. *Marcus v. AT&T Corp.*, 138 F.3d 46, 61 (2d Cir. 1998). The Second Circuit rejected this argument, explaining that "[t]he filed rate doctrine prevents more than judicial rate-setting; it precludes *any* judicial action which undermines agency rate-making authority." *Id.* (emphasis added).

In addition, allowing CallerID4u to bring state law claims would "discourage conduct that federal legislation specifically seeks to encourage" under the 1996 Act. *City of Morgan City v. S. La. Elec. Co-op. Ass'n*, 31 F.3d 319, 322 (5th Cir. 1994). In exercising its § 160 forbearance authority, the FCC determined that CLECs do not need to file tariffs only under limited circumstances, i.e., if they negotiate agreements with IXCs. *See Access Reform Order*, 16 FCC Rcd. at 9925; *see also Great Lakes*, 30 FCC Rcd. at 2588; *All American II*, 28 FCC Rcd. at 3480. Relieving CLECs of their obligation to file a tariff under § 203 if they fail to negotiate an agreement would create an incentive for CLECs to neither negotiate an agreement nor file a tariff, knowing they could bring state law equitable claims instead.

The Tenth Circuit reached a similar conclusion in an analogous case. *See Union Tel. Co. v. Qwest Corp.*, 495 F.3d 1187, 1197 (10th Cir. 2007). In *Union Telephone*, the Tenth Circuit considered whether the plaintiff, a telecommunications provider that was required under federal law to set rates through interconnection agreements, could instead recover damages under a theory of unjust enrichment or quantum meruit. *Id.* at 1190, 1197. The defendant argued

that federal law preempted the plaintiff's equitable claims. *Id.* at 1196. The Tenth Circuit agreed, holding that although the plaintiff had "shown facts that might support each element of the unjust enrichment claim," equitable relief was "not appropriate under the circumstances." *Id.* at 1197. The Tenth Circuit explained that "[b]ecause federal law requires parties such as Qwest and Union to set rates through interconnection agreements, allowing Union to recover damages under a theory of unjust enrichment or quantum meruit would frustrate the federal regulatory mechanism." *Id.* (citation omitted). Therefore, the court concluded that "it is inappropriate to imply a contract in equity considering that under federal law Union had an obligation to contract directly with Qwest but chose not to do so." *Id.*

We also find support for our conclusion in the FCC's decisions in this area, where the FCC has expressed its view on the role that state law equitable claims can play under the current CLEC regulatory regime. Although the FCC lacks the authority to consider the merits of state law claims, *see All Am. Tel. Co.*, 867 F.3d at 89, the FCC has authority to consider the preemptive effect of the statute it enforces, *see Wyeth*, 555 U.S. at 576–77. While we do not need to defer to the FCC's views, we do give it weight where its reasoning is persuasive. *See id.* at 577 ("The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness."). In the *All American II* orders, the FCC indicated that state law equitable claims would conflict with the current CLEC regulatory scheme. The FCC explained that, in its view, because CLECs are required to either negotiate agreements or file tariffs under § 203, they cannot "seek equitable relief relating to matters subject to regulation." *All American II Damages*, 30 FCC Rcd. at 8963,

8963 n.50.  The FCC explained that, in holding that the *All American II* CLECs had violated § 203 by billing for switched access services in the absence of a valid tariff or negotiated agreement, the FCC had not intended to leave a "'regulatory gap' entitling [the CLECs] to pursue alternate damage theories." *Id.* at 8963 n.50.  Allowing the CLECs to bring state law equitable claims under those circumstances would effectively allow them to "avoid the [FCC's] regulation of competitive interstate switched access services." *Id.*[12]

We agree with the reasoning of both the Tenth Circuit in *Union Telephone* and the FCC in *All American II* and conclude that the preemptive effect of the filed rate doctrine precludes CallerID4u from recovering damages under a theory of unjust enrichment or quantum meruit.[13]

---

[12] In light of the FCC's clear statement in *All American II* that state law equitable claims would interfere with the CLEC regulatory scheme, *All American II Damages*, 30 FCC Rcd. at 8963 n.50, we give little weight to the FCC's passing remark in its prior decision, *All American Telephone Co. v. AT&T Corp.* ("*All American I*"), that carriers may in some circumstances be entitled to some compensation for services not specified in a tariff, depending on "the totality of the circumstances." *All American I*, 26 FCC Rcd. 723, 731 (2011).  We likewise reject CallerID4u's reliance on *New Valley Corp. v. Pacific Bell*, 8 FCC Rcd. 8126 (1993).  In that case, the FCC rejected a carrier's argument that it was entitled to a refund for the charges it had paid a LEC for services that fell outside the terms of the LEC's tariff.  *Id.* at 8126–27.  That decision has little value here because it predated the 1996 Act and the 2001 *Access Reform Order*.

[13] Although the Eighth Circuit concluded that a carrier could be paid the contract rate for its fully completed services, even after a new judicial ruling clarified that the carrier was subject to the filed rate doctrine, *see Ets-Hokin & Galvan, Inc. v. Maas Transp., Inc.*, 380 F.2d 258, 260–61 (8th Cir. 1967), we do not find it persuasive in this context, because the Eighth Circuit relied on the unique equities of the case and did not explain

We likewise reject CallerID4u's claims that it is entitled to state law remedies for the period after CallerID4u's tariff went into effect on September 28, 2012 as barred by the filed rate doctrine. CallerID4u acknowledges that it filed a tariff with the FCC, but argues that it pleaded its state law claims as "alternative[s]" to its federal tariff claims in the event that a court were to conclude that its tariff is invalid (e.g., if it determined that CallerID4u was engaged in access stimulation) or that it provided switched access services not covered by the terms of its tariff. Because CallerID4u voluntarily dismissed its federal tariff claims, the validity of its tariff is not before us.

V

As a secondary state law claim, CallerID4u argues that even if it is subject to the tariff-filing requirements of § 203(c), and therefore cannot raise state quasi-contract or equitable theories, it is nevertheless entitled to recover under the WCPA's prohibition of "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

In raising this argument, CallerID4u relies on our decision in *In re NOS Communications*, 495 F.3d 1052 (9th Cir. 2007). In that case, the customer of a telephone carrier claimed that the carrier had violated the WCPA "by marketing false billing information and by failing to notify consumers of differences between the quoted price and the actual price." *Id.* at 1057. Because these claims did not involve any challenge to the filed rate, nor did they suggest that some other rate should

---

why the well-established preemptive effect of the filed rate doctrine was not applicable.

apply, we reasoned that the customer's claims could be "maintained without reference to federal law" and "would not necessarily require a setting aside of the filed tariff or a renegotiation of its terms." *Id*. at 1059. Accordingly, we held that the customer's WCPA claims were not preempted. *Id.*

*NOS* does not help CallerID4u, however, because CallerID4u does not allege any unfair or deceptive acts. In order to prove "an unfair or deceptive act or practice" for purposes of the WCPA, a plaintiff must show "that the alleged act had the capacity to deceive a substantial portion of the public." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 785 (1986) (emphasis omitted). "Even accurate information may be deceptive if there is a representation, omission or practice that is likely to mislead." *Bain v. Metro. Mortg. Grp., Inc.*, 175 Wash. 2d 83, 115 (2012) (internal quotation marks omitted). While CallerID4u argues that AT&T's and Verizon's "repeated refusal to pay for services received," constitutes an unfair and deceptive act, a refusal to pay for a carrier's services when the carrier has not filed a tariff or negotiated a contract is not an act with "the capacity to deceive a substantial portion of the public." *Hangman Ridge Training Stables, Inc.*, 105 Wash. 2d at 785 (emphasis omitted). Nor is the simple refusal to pay an unauthorized charge a practice that is "likely to mislead." *Bain*, 175 Wash. 2d at 115. CallerID4u cites no cases to the contrary. Accordingly, we conclude that CallerID4u failed to state a

claim under the WCPA, and the district court did not err in dismissing CallerID4u's WCPA claims.**[14]**

**AFFIRMED.**

---

**[14]** We do not reach the district court's alternative holding that the WCPA's statutory exemption codified at § 19.86.170 of the Revised Code of Washington barred CallerID4u's WCPA claims against AT&T and Verizon.