## BUILDING CODES

**MANUFACTURED HOMES – FIRE SPRINKLERS – WHETHER STATE LAW REQUIRES FIRE SPRINKLER SYSTEMS TO BE INSTALLED IN MANUFACTURED HOMES – WHETHER FEDERAL LAW WOULD PREEMPT SUCH A REQUIREMENT**

March 2, 2022

*The Honorable Joseph M. Mitrecic*
*President, Board of County Commissioners of Worcester County*

You have asked whether Maryland law requires the installation of fire sprinkler systems in manufactured homes. Manufactured homes, which are built in factories and transportable on wheels, are constructed in compliance with regulations developed by the U.S. Department of Housing and Urban Development ("HUD"). Although a manufactured home might have a fire sprinkler system, federal law does not require one. Maryland statutes enforced by the State Fire Marshal do require the installation of fire sprinklers in certain types of buildings. But last year, the State Fire Marshal issued informal guidance opining that while Maryland law requires installation of fire sprinklers in most types of one- and two-family homes, it does not require them in manufactured homes.

We agree with the State Fire Marshal that State law does not currently require the installation of fire sprinklers in manufactured homes. As an initial matter, although the federal statute that grants HUD authority over manufactured homes contains an express preemption provision, it would not preempt a state or local requirement that manufactured homes be equipped with fire sprinklers. The federal statute provides that state and local governments can impose additional requirements on manufactured homes where HUD's regulations are silent, and HUD's regulations are silent on fire sprinklers.

While the State could mandate fire sprinklers in manufactured homes, neither the General Assembly nor the Maryland Department of Labor ("DOL"), which maintains the State's building codes and administers the State's regulatory program for manufactured homes, has done so. The statewide building standards administered by DOL—known as the Maryland Building Performance Standards ("MBPS")—do require fire sprinklers in those homes that they govern. But neither the statute adopting the MBPS nor the MBPS regulations evince an intent to apply to

*manufactured* homes. Rather, the State has consistently maintained a separate statutory and regulatory scheme for manufactured homes. That is likely because a detailed regulatory code—the HUD standards—already existed for manufactured homes when the General Assembly established the MBPS. The purpose of the MBPS, instead, was to regulate traditional "site-built" buildings, including site-built homes, which had previously been subject to a patchwork of inconsistent local requirements.

Notably, both the State Fire Marshal and the Maryland Department of Housing and Community Development ("DHCD") (DOL's predecessor as building regulator) have also concluded that the MBPS sprinkler requirement does not govern manufactured homes. We owe considerable deference to interpretations of statutes by the agencies charged with administering them. For all of these reasons, we conclude that the language of the MBPS statute and regulations, which does not specifically address manufactured homes, was not intended to cover them. Thus, no provision of Maryland law currently requires fire sprinklers in manufactured homes.

# I
# Background

## A. *Manufactured Homes*

A manufactured home is a single-family home that is built in a factory on a wheeled chassis, then towed to the site where it will be used as a house. Maryland Dep't of Labor, Building Codes Admin., *What Is a Modular and a Manufactured (Mobile) Home?*, https://www.dllr.state.md.us/labor/build/buildmoddef.shtml (last visited Feb. 25, 2022). Once the home arrives on site, installers normally remove the wheels, then connect it to utilities and stabilize it in place. *See* James Milton Brown & Molly A. Sellman, *Manufactured Housing: The Invalidity of the "Mobility" Standard*, 19 Urb. Law. 367, 376 (1987). Manufactured homes are sometimes called "mobile homes." *Id.* at 371. But that term is often a misnomer: though a manufactured home once placed can in theory be moved again, that rarely happens in practice, due to high moving costs and limited options for placement. Amy J. Schmitz, *Promoting the Promise Manufactured Homes Provide for Affordable Housing*, 13 J. Affordable Housing & Community Dev. L. 384, 385, 389 (2004). Manufactured homes are frequently, but not always, placed in parks where the residents own their homes but rent the underlying land from the park owner. *Id.* at 388. In 2017, there were 39,300 manufactured homes in Maryland (about

2% of the State's total housing stock), and since then, approximately 100 new units per year, on average, have been shipped to Marylanders.[1]

HUD is the primary regulator of manufactured home design and construction under the National Manufactured Home Construction and Safety Standards Act, 42 U.S.C. §§ 5401-5426 (the "Federal Act"). Congress charged HUD with ensuring that manufactured homes are durable and safe but also affordable and subject to nationally uniform standards. 42 U.S.C. § 5401. To those ends, HUD promulgates and maintains the "Federal Manufactured Home Construction and Safety Standards" (the "HUD standards"). 24 C.F.R. pt. 3280. The HUD standards regulate aspects of the manufactured home including minimum room size; light and ventilation; structural integrity; insulation; plumbing, heating, cooling, and electrical systems; and fire safety. *See id.* Inspectors certified under HUD's authority approve each manufactured home design for compliance with these standards and oversee construction at each factory. 24 C.F.R. §§ 3282.203, 3282.204, 3282.361, 3282.362. These inspectors issue "HUD labels" which manufacturers attach to each home to certify compliance with the HUD standards. *Id.* § 3282.205, 3282.362. The Federal Act prohibits the sale of a new manufactured home without a HUD label. *See* 42 U.S.C. § 5409.

The Federal Act preempts state and local regulation of any "aspect of [manufactured home] performance" that the HUD standards address. *Id.* § 5403(d). But the Act also expressly recognizes that states can regulate "any manufactured home construction or safety issue" where no HUD standard applies. *Id.* § 5422(a). The Act also allows a state to take over enforcement of the HUD standards as a delegate of HUD, subject to the same preemption rules. *See id.* § 5422(b). Within Maryland, DOL oversees enforcement of the HUD program, having taken over that role from DHCD in 2018. Md. Code Ann., Pub. Safety ("PS") § 12-312; 2018 Md. Laws, ch. 673.

### B. *Other Types of Single-Family Homes*

Other statutory and regulatory schemes govern the design and construction of other types of homes. A "site-built" or "stick-built"

---

[1] *See* U.S. Census Bureau, American Housing Survey, Maryland—General Housing Data (2017), https://www.census.gov/programs-surveys/ahs.html; U.S. Census Bureau, Manufactured Housing Survey, Shipments of New Manufactured Homes (2021), https://www.census.gov/data/tables/time-series/econ/mhs/shipments.html.

home is constructed in the traditional manner—from scratch, on the site where it will permanently stand. In Maryland, local governments are the primary regulators of site-built homes, although, as we will explain, the State has attempted to balance that local autonomy with uniform statewide standards. *See* PS §§ 12-502 to 12-505.

Originally, the regulation of site-built home construction was exclusively a matter for local governments, which focused on preventing fires. 5 Philip L. Bruner & Patrick J. O'Connor, Jr., *Construction Law* § 16:2 (Aug. 2021 update). For example, a 1799 Baltimore City ordinance prohibited the construction of wooden buildings in the City center. Baltimore City Ord. No. 22 (June 11, 1799). Over time, as construction techniques grew more complex and builders adopted more dangerous technologies, regional and national standard-setting organizations began to develop model building codes, which local and state governments would then adopt. Bruner & O'Connor, *supra*, § 16:2. Local jurisdictions in Maryland adopted a variety of model codes—with the Building Officials and Code Administrators ("BOCA") Code as the most popular—and some continued with no code at all. Report of the Maryland Building Performance Standards Task Force 3 (1993) ("MBPS Report"); 1993 Md. Laws, ch. 200 (Preamble).

To clear away this regulatory tangle, the General Assembly in 1993 directed DHCD to establish by regulation a new statewide building code: the Maryland Building Performance Standards. 1993 Md. Laws, ch. 200 (enacting Art. 83B, §§ 6-401 to 6-406, now codified as amended at PS §§ 12-501 to 12-510). The new MBPS regulations were based on the BOCA Code and incorporated it by reference. *Id.* (enacting Art. 83B, § 6-402, now codified as amended at PS § 12-503). The MBPS statute required each local jurisdiction to use the MBPS as its building code but allowed local governments to adopt local amendments to the MBPS regulations, including amendments establishing different or less stringent standards. *See id.* (codified as amended at PS §§ 12-503 and 12-504). Thus, each MBPS provision applies in each jurisdiction unless the local government opts out of a particular requirement. The State also continued to leave building code enforcement to localities. *Id.* (codified as amended at PS § 12-502(c)). In 2000, several standard-setting organizations merged into the International Codes Council, and the new International Building Code superseded the BOCA Code. *See* 2000 Md. Laws, ch. 39.

Today, the MBPS regulations incorporate several International Codes, each regulating a different construction-related subject. COMAR 09.12.51.04. Most relevant here, the International Residential Code ("IRC") sets standards for the design and construction of one- and two-family homes.[2] When the International Codes Council updates one of these model codes (which normally happens every three years), the Department of Labor must update the MBPS within eighteen months, though the agency has some discretion to make modifications to the codes before adopting each version as part of the MBPS. PS § 12-503.

"Modular homes" make up a third category distinct from both manufactured and site-built homes. Modular homes are built in a factory (often in multiple sections) like a manufactured home, but they are designed to be installed on a permanent foundation and never moved again, like a site-built home. *What Is a Modular and a Manufactured (Mobile) Home?*, *supra*. HUD does not regulate modular homes. *See* 42 U.S.C. § 5403(f). In Maryland, modular homes are classified as "industrialized buildings," which are subject to a set of DOL regulations that is based on, but separate from, the MBPS. *See* PS §§ 12-301(d), 12-305. However, the industrialized building regulations incorporate many of the same model code provisions by reference, which means that in substance modular homes, like site-built homes, are mainly governed by the International Residential Code. *See* COMAR 09.12.50.02-1, 09.12.52.06, 09.12.52.07.

## C.   *Fire Sprinklers*

The question of whether to mandate the installation of fire sprinklers in new buildings, especially single-family homes, has been the subject of frequent policy debates in recent years. A fire sprinkler system consists of sprinkler heads in various rooms of a building, connected to pressurized water pipes. If the air temperature around a sprinkler head reaches a certain level, indicating that there is a fire in the room, that sprinkler head opens and sprays water to extinguish the fire or at least suppress it long enough for the building's occupants to escape and for firefighters to arrive.[3]

---

[2] All HUD-regulated manufactured homes are single-family homes. *See* 24 C.F.R. § 3282.8(*l*).

[3] Nat'l Fire Protection Ass'n, *How Home Fire Sprinklers Work*, https://www.nfpa.org/Public-Education/Staying-safe/Safety-equipment/Home-fire-sprinklers/Fire-Sprinkler-Initiative/Take-action/Free-downloads/How-sprinklers-work (last visited Feb. 25, 2022).

Proponents of mandated fire sprinkler installation argue that fire sprinkler systems dramatically reduce house-fire deaths among civilians and firefighters.[4]  For example, as of 2020, Prince George's County had not recorded a single fire death in a home with a functioning sprinkler system for nearly thirty years, compared to an average of ten fire deaths per year in homes without sprinklers.  *Hearing on H.B. 823 Before the House Env't & Transp. Comm.*, 2020 Leg., Reg. Sess. (Feb. 25, 2020) (written testimony of the Prince George's County Executive).  Opponents contend, however, that sprinkler systems are costly to install and that mandating them across the board could impair the availability of affordable housing.  *See, e.g.*, *Hearing on S.B. 602 Before the Senate Educ., Health, & Env'tl Affairs Comm.*, 2012 Leg., Reg. Sess. (Feb. 28, 2012) (written testimony of the Caroline County Commissioners).

In 2008, the International Codes Council amended the International Residential Code to mandate fire sprinklers in those new one- and two-family homes covered by the IRC.  *ICC Approves Sprinkler Requirement in Family Dwellings*, 32 Construction Cont. L. Rep. 247 (Nov. 6, 2008).  The IRC's new sprinkler mandate took effect in Maryland on January 1, 2011, after DHCD updated the MBPS regulations to incorporate the new Code version.  36:16 Md. Reg. 1255, 1255 (July 31, 2009).  Several local governments then exercised their local amendment authority to opt out.  *See* PS § 12-504; Revised Fiscal & Policy Note for H.B. 366, 2012 Leg., Reg. Sess.  The General Assembly responded in 2012 by prohibiting local governments from opting out of the MBPS sprinkler mandate.  2012 Md. Laws, chs. 265, 266 (enacting PS § 12-504(a)(1)(iii)).  In 2020, the General Assembly, concerned that some jurisdictions were still not enforcing the sprinkler mandate, transferred responsibility for its enforcement to the State Fire Marshal.  2020 Md. Laws, ch. 334 (enacting PS § 6-305(a)(3)); *Hearing on H.B. 823 Before the House Env't & Transp. Comm.*, 2020 Leg., Reg. Sess. (Feb. 25, 2020).

None of these statutory and regulatory amendments addressed whether or how the sprinkler mandate would apply to manufactured homes.  A 2017 memorandum issued by DHCD concluded that State law does not currently require fire sprinklers in manufactured homes.  Memorandum from Norman C. Wang, Director, Maryland Codes Administration, to Maryland Local Building Officials and the Office of the Maryland State Fire

---

[4] *See* Marty Ahrens, Nat'l Fire Protection Ass'n, *U.S. Experience With Sprinklers* (Oct. 2021), https://www.nfpa.org/News-and-Research/Data-research-and-tools/Suppression/US-Experience-with-Sprinklers.

Marshal (Aug. 11, 2017) ("Wang Memorandum"). And in 2021, the State Fire Marshal also opined that State law requires sprinklers in new one- and two-family site-built and modular homes but not in manufactured homes. Office of the State Fire Marshal, Requirements for Automatic Residential Fire Sprinkler Systems in One- and Two-Family Dwellings (May 17, 2021) ("Fire Marshal Memorandum"). But we have not previously addressed this issue.

## II
## Analysis

To answer your question, we first consider whether the preemption provision in the Federal Act that applies to manufactured homes would bar Maryland from imposing a fire sprinkler requirement on such homes. We conclude that it would not, because while the HUD standards address some aspects of fire safety, they do not address fire sprinklers or fire suppression more generally. We also conclude, however, that Maryland law does not currently apply a fire sprinkler mandate to manufactured homes. The Maryland Building Performance Standards—the source of the State's fire-sprinkler mandate for one- and two-family homes— were not intended to govern manufactured homes, which have had their own regulatory regime since before the MBPS took effect.

### A. *Federal Preemption*

The Federal Act governing manufactured homes is structured to balance national uniformity with state and local autonomy. The statute preempts state and local law governing manufactured home construction and safety, but only when it addresses an "aspect of performance" that the HUD standards also address. *See* 42 U.S.C. §§ 5403(d), 5422(a). As we will explain, because the HUD standards address fire safety generally but not fire sprinklers in particular, the Federal Act would not preempt a state or local fire sprinkler mandate.

Federal law can preempt state law in one of three ways. *See Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020). First, federal law may expressly preempt state law. *See, e.g.*, *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S. Ct. 1190, 1194 (2017). Second, federal law may implicitly preempt a state from legislating in a particular "field," by covering that field so comprehensively as to leave no room for state legislation on the same topic. *See, e.g.*, *Kurns v. Railroad Friction Prods. Corp.*, 565 U.S. 625, 630-31 (2012). Third, state law may be preempted when it conflicts with federal law, either by placing an actor in a position where

compliance with both federal and state law is impossible, *see, e.g.*, *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472, 479-80 (2013), or by posing an "obstacle to the accomplishment and execution of the full purposes and objectives" of the federal law, *see, e.g.*, *Arizona v. United States*, 567 U.S. 387, 399-400 (2012) (citation omitted). In doubtful cases, federal courts will apply a presumption against federal preemption, especially when "the historic police powers of the States" are involved. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

The Federal Act contains an express preemption provision, but it is limited in scope. The Act first provides that when a HUD manufactured home standard exists in a particular area, conflicting or additional state or local standards are displaced:

> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding the construction or safety *applicable to the same aspect of performance* of such manufactured home which is not identical to the Federal manufactured home construction and safety standard. Federal preemption under this subsection shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter.

42 U.S.C. § 5403(d) (emphasis added). The statute thus suggests that states and localities may enforce standards for manufactured home construction and safety as long as they do not address an "aspect of performance" that the HUD standards also address. Section 5422(a) confirms that suggestion:

> Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any manufactured home construction or safety issue with respect to

> which no Federal manufactured home construction and safety standard has been established pursuant to the provisions of section 5403 of this title.

42 U.S.C. § 5422(a). The reference to state agencies alongside courts confirms Congress contemplated that not only state common law and statutes but also state regulations could apply to manufactured homes, provided they address an "issue" that federal regulations do not address. *See id.*

The HUD standards are silent regarding fire sprinklers. It is true that the standards do address fire safety generally. 24 C.F.R. §§ 3280.201 to 3280.210. But HUD's fire safety standards primarily deal with the flammability of construction materials, *see, e.g.*, *id.* § 3280.203, and smoke alarms, *id.* § 3280.209. They do not address fire suppressing or fire extinguishing systems, let alone automatic fire sprinklers specifically. Thus, it appears that a state or local sprinkler mandate for manufactured homes would not be preempted under § 5403(d) and § 5422(a), because there is no federal standard addressing that particular "aspect of performance" of manufactured homes.

This conclusion accords with HUD's consistent, albeit informal, view. "When considering whether a federal statute preempts state law, we may look to the pronouncements of the federal agency that administers the statute for guidance." *CallerID4u, Inc. v. MCI Commc'ns Servs. Inc.*, 880 F.3d 1048, 1061 (9th Cir. 2018) (citing *Wyeth*, 555 U.S. at 576-77). Here, those pronouncements confirm that state sprinkler requirements are not preempted. In 1992, for example, the HUD official in charge of the agency's manufactured housing program advised that a local sprinkler mandate in Massachusetts was not preempted, presumably because the HUD standards did not address sprinklers. Letter from David C. Nimmer, Director, Office of Manufactured Housing and Regulatory Functions, U.S. Dep't of Hous. & Urb. Dev., to Jerry C. Connors, President, Manufactured Housing Inst. (Jan. 23, 1992) (included in bill file for H.B. 316, 1992 Leg., Reg. Sess.). And an informal guidance document currently available on HUD's website states that "HUD has long held that state and local sprinkler requirements are . . . not preempted by the general fire safety standards."[5]

---

[5] U.S. Dep't of Hous. & Urban Dev., FAQs: Manufactured Housing Improvement Act of 2000, https://www.hud.gov/program_offices/

It might be argued that the phrase "aspect of performance" should be read more expansively as referring to a broad category of regulation, like fire safety. On that view, because the HUD standards address some aspects of fire safety, state and local regulation would be foreclosed as to all aspects of fire safety in manufactured homes. But HUD has not construed the preemption standard so broadly; instead, the agency's view has been that "for there to be Federal preemption, there must be a *specific aspect* of a Federal performance standard which duplicates a local standard." Manufactured Housing Construction and Safety Standards: Notice of Internal Guidance on Preemption, 62 Fed. Reg. 3456, 3458 (Jan. 23, 1997) (emphasis added).

Case law under a similar preemption provision in the National Traffic and Motor Vehicle Safety Act of 1966, on which the HUD statute's preemption language appears to have been based, *see* Pub. L. No. 89-563, 80 Stat. 718, § 103(d), also favors a narrower reading. That motor vehicle statute requires that there be a federal standard addressing the specific safety feature at issue before state and local requirements will be preempted. *See Chrysler Corp. v. Rhodes*, 416 F.2d 319, 325 (1st Cir. 1969), *on pet. for reh'g* (interpreting "aspect of performance" as referring to "an item or category of equipment"); *Chrysler Corp. v. Tofany*, 419 F.2d 499, 506 (2d Cir. 1969) (same); *cf. Freightliner Corp. v. Myrick*, 514 U.S. 280, 286-87 (1995) (holding that suspension of one specific vehicle safety regulation eliminated express preemption on the topic that regulation had addressed). Notably, *Rhodes* and *Tofany* predate the enactment of the federal manufactured home statute in 1974, suggesting that Congress would have been aware of the effect of language similar to the language that had been interpreted in those cases. Under that understanding, then, because the HUD standards do not address the specific issue of fire sprinklers, the Federal Act would not expressly preempt a state or local fire sprinkler mandate.

Nor does field preemption apply here. Congress's inclusion of an express preemption provision in a statute ordinarily implies that there is no field preemption beyond the express preemption provision's scope, because the text of the preemption provision indicates how far Congress wished preemption to extend. *See Myrick*, 514 U.S. at 287-89; *Sprietsma v. Mercury Marine*, 537

---

housing/rmra/mhs/faqs72010 (last visited Feb. 25, 2022). The document also references a 2010 proposal by HUD to adopt a voluntary sprinkler standard that would only apply in jurisdictions that chose to mandate sprinklers. *See id.* However, HUD did not ultimately adopt that proposal, for reasons that are not clear. *See* 24 C.F.R. pt. 3280, subpt. C.

U.S. 51, 69 (2002). *But see National Fed'n of Blind v. United Airlines, Inc.*, 813 F.3d 718, 732-33 (9th Cir. 2016) (holding that field preemption could apply beyond express preemption in the particular, heavily regulated area at issue, namely air travel). Here, that inference is especially strong because Congress in § 5422(a) expressly recognized the boundaries of the Federal Act's preemptive scope. *See, e.g.*, *Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*, 423 F.3d 1056, 1072 (9th Cir. 2005) (recognizing under another statutory scheme that "by expressly limiting federal preemption to state requirements that are inconsistent with the federal regulations, Congress signaled its intent not to occupy the entire field" (emphasis omitted)). Courts have thus held that the Federal Act does not preempt the entire field of manufactured home construction and safety. *See, e.g.*, *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 620 F. Supp. 2d 755, 762 (E.D. La. 2009) (so holding in the context of a common-law tort claim); *Harrison v. Skyline Corp.*, 686 S.E.2d 735, 742 (W.Va. 2009) (same).

Finally, conflict preemption would not defeat a sprinkler mandate. Although the existence of an express preemption provision "does not bar the ordinary working of conflict pre-emption principles," *e.g.*, *Hillman v. Maretta*, 569 U.S. 483, 498 (2013) (citation and emphasis omitted), those ordinary principles indicate that there is no preemption here, under either an impossibility preemption or an obstacle preemption theory. As an initial matter, there is no viable argument that it would be impossible for a manufacturer to comply with both federal law and a state or local sprinkler mandate, because nothing in the HUD standards *prohibits* the installation of fire sprinklers in manufactured homes. Turning to obstacle preemption, we recognize that "Federal preemption under [§ 5403(d)] shall be broadly and liberally construed" to protect the "uniformity and comprehensiveness" of the HUD standards. 42 U.S.C. § 5403(d). But § 5422(a)'s express recognition of state authority to regulate manufactured home construction and safety in areas not subject to federal standards undermines any claim that a state manufactured home regulation on a single, limited issue like fire sprinklers could be an obstacle to the fulfillment of congressional intent. There is no indication of a congressional purpose to preclude a narrowly focused state regulation in an area where HUD has been silent (and acknowledged its silence). *See Wyeth*, 555 U.S. at 565 ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case."). National uniformity is only one of the purposes of the Federal Act; Congress also sought to promote safety and prevent personal injuries and property damage in manufactured

homes. *See* 42 U.S.C. § 5401. Indeed, the Federal Act's preemption provisions seem to have been designed to balance national uniformity with a continuing regulatory role for the states. *See id.* §§ 5403(d), 5422(a). The presumption against federal preemption in areas traditionally subject to state regulation—a category that certainly includes building codes—strengthens the conclusion that there is no preemption here. *See Wyeth*, 555 U.S. at 565. We thus conclude that the Federal Act leaves state and local governments free to mandate fire sprinklers in manufactured homes within their jurisdictions.

## B.   State Law

We next consider whether State law has in fact mandated fire sprinklers in manufactured homes in Maryland. In our view, the answer is no. Although the Maryland Building Performance Standards do require fire sprinklers in those one- and two-family homes to which they apply, the General Assembly and the relevant regulatory agencies did not intend the Standards to apply to HUD-regulated manufactured homes.[6]

Given the absence of federal preemption, the General Assembly could, if it chose, require fire sprinklers in manufactured homes. Similarly, the Maryland Department of Labor could likely impose such a requirement under the broad authority delegated by PS § 12-305(d), which empowers DOL to "adopt regulations that relate to issues of construction or safety of manufactured homes for which a federal standard has not been established[.]"[7] However, no current Maryland statute or regulation expressly mandates fire sprinklers in manufactured homes specifically.

---

[6] You did not ask, and so we do not consider, whether State law would preempt a local mandate requiring installation of fire sprinklers in manufactured homes.

[7] We recognize that DOL may not adopt regulations under PS § 12-305(d) in any area "reserved to a local government under [PS] § 12-303." PS § 12-305(d). PS § 12-303, in turn, reserves local government authority to enact "uniform fire control regulations." However, we have construed the phrase "uniform fire control regulations," in an opinion dealing with modular homes, as preserving exclusive local authority only over fire control regulations that do not directly address building design and construction, such as subdivision density restrictions and rules for placement of fire hydrants. 75 *Opinions of the Attorney General* 308, 314 (1990). Section 12-303 thus would not prevent DOL from adopting a fire sprinkler mandate for manufactured homes.

The Maryland Building Performance Standards—the statewide building regulations maintained by DOL—*do* clearly require fire sprinklers. Specifically, the MBPS regulations currently incorporate the 2018 edition of the International Residential Code. COMAR 09.12.51.04. The International Residential Code, in turn, requires the installation of fire sprinklers in new one- and two-family homes. Int'l Residential Code § R313.2 (2018).[8] We thus consider whether the MBPS requirements apply to manufactured homes.

If one were to look just at the language of the MBPS statute (and its implementing regulations) in isolation, that language could well suggest that their requirements (including the fire sprinkler mandate) apply to manufactured homes. Under that statute and those regulations, the MBPS requirements apply to "each building or structure in the State for which a building permit application is received by a local jurisdiction[.]" PS § 12-503(c); *accord* COMAR 09.12.51.06A. The definitions of "building" and "structure" are taken from the International Building Code, PS § 12-501(b), (i), and would seem to include a manufactured home. *See* Int'l Building Code § 202 (2018) (defining a "structure" as "[t]hat which is built or constructed" and a "building" as "[a]ny structure utilized or intended for supporting or sheltering any occupancy"). Maryland law also requires local building permits for manufactured homes, and federal law does not exempt manufactured homes from local permit requirements. PS § 12-312(b)(6); COMAR 09.12.52.15G(3); 24 C.F.R. § 3285.901. If we were to read the MBPS statute in isolation, then, the MBPS and its fire sprinkler mandate might well

---

[8] It is not clear whether the IRC, taken by itself, applies to manufactured homes. On the one hand, the IRC by its own terms applies to the construction of all "detached one- and two-family dwellings and townhouses" with limited exceptions not relevant here. Int'l Residential Code § R101.2 (2018). The Code, in turn, defines "dwelling" as "[a]ny building that contains one or two dwelling units" that are used, intended, or designed to be occupied "for living purposes," *id.* § R202, and defines "dwelling unit" as "[a] single unit providing complete independent living facilities for one or more persons," *id.* These definitions appear broad enough to include manufactured homes in the IRC's scope. On the other hand, Appendix E to the IRC specifically addresses "manufactured housing used as dwellings," but does not set any standards for the design or construction of the movable portion of the home, deferring instead to the HUD standards. *See id.* App'x E. This could imply that the IRC as a whole is not intended to regulate manufactured home design and construction. Because we conclude below that the General Assembly and DOL did not intend the MBPS regulations to apply to manufactured homes, we need not decide whether the IRC standing alone would apply to them.

apply to manufactured homes, as they are "buildings"—structures that are intended for occupancy—and local building permits must be obtained in order to install them.

We do not interpret statutes in isolation, however. Instead, we instead consider the entire statutory scheme, including other statutes dealing with the same subject. *See, e.g.*, 100 *Opinions of the Attorney General* 85, 92-93 (2015). Here, that means we must consider how a broad reading of PS § 12-503(c) would interact with other laws governing manufactured homes. In considering the logical result of such a reading, it is important to note that § 12-503(c) provides for the application of the MBPS *as a whole*; it does not differentiate among particular MBPS provisions. That means that, if we were to read PS § 12-503(c) as covering manufactured homes, it would follow that the *entirety* of the MBPS would apply to manufactured homes, including the entire International Residential Code. Under that reading, manufactured homes would be presumptively subject not only to the IRC's fire sprinkler mandate but also to that Code's provisions governing foundations, floors and walls, plumbing, electrical systems, and many other areas. *See generally* Int'l Residential Code (2018). Although the Federal Act would preempt any requirement related to an "aspect of performance" that the HUD standards also address, the IRC's comprehensive provisions would apply wherever the Federal Act is silent. *See* 42 U.S.C. §§ 5403(d), 5422(a).

We doubt that the General Assembly, in enacting PS § 12-503(c), intended that result. When the Legislature enacted the MBPS statute, including § 12-503(c), in 1993, it was aware that a detailed and complex construction and safety code—the HUD standards—already existed for manufactured homes. *See, e.g.*, *Junek v. St. Mary's County Dep't of Soc. Servs.*, 464 Md. 350, 363 (2019) (explaining that the General Assembly is presumed to act with knowledge of existing law). In fact, the General Assembly itself had also already enacted separate legislation governing manufactured homes years earlier, acknowledging the federal requirements and delegating specific authority to the then-Department of Economic and Community Development to supplement the federal requirements by regulation, to the extent necessary and permitted by federal preemption. 1976 Md. Laws, ch. 422 (enacting Art. 41, § 266EE-7, now codified as amended at PS §§ 12-305(d) and 12-312). A statewide code also already

existed for modular homes.  *See* 1971 Md. Laws, ch. 662 (enacting Art. 41, § 266EE-3, now codified as amended at PS § 12-305).

The primary purpose behind the MBPS was instead to establish a statewide building code for *site-built* buildings, which were, at the time, governed by a patchwork of inconsistent local building codes (and, in some jurisdictions, no building code at all). *See* 1993 Md. Laws, ch. 200 (Preamble) (explaining that the purpose of the MBPS was to replace the "nine different codes" for site-built buildings enacted by "19 counties and 59 municipalities in Maryland"); MBPS Report, *supra*, at 3 (same).  Because manufactured homes already had a statewide—indeed, a nationwide—code (the HUD standards), we infer that the General Assembly did not expect that the MBPS, a different but largely overlapping statewide code, would apply to manufactured homes. Although perhaps DOL could apply the MBPS to manufactured homes under its regulatory authority (except to the extent preempted by federal law), *see* PS § 12-305(d), we do not believe that the General Assembly intended PS § 12-503(c), which does not expressly address manufactured homes at all, to have that effect.

Indeed, in line with that understanding, the General Assembly has consistently maintained separate statutory and regulatory schemes for site-built buildings, modular homes, and manufactured homes.  In 1971, when the General Assembly enacted the first State statute governing manufactured homes and industrialized buildings (before there was any federal law on the subject), the Legislature mandated that the then-Department of Economic and Community Development ("DECD") adapt one of the national model building codes for industrialized buildings but that it develop a separate set of standards for manufactured homes.  *See* 1971 Md. Laws, ch. 662 (enacting Art. 41, § 266EE-3).  That distinction suggests a legislative intent that manufactured homes should be subject to separate rules developed specifically for them, as opposed to rules primarily developed for other types of homes.  The agency complied and developed a separate set of regulations for manufactured homes based on a different model code.  *See* Memorandum from Dep't of Econ. & Cmty. Dev. to House Econ. Matters Comm. on H.B. 724 (1976); 1971 Md. Laws, ch. 662 (enacting Art. 41, § 266EE-3).  Another statute passed at the same session in 1971 directed the agency to develop yet a third code:  a voluntary Model Performance Code for site-built buildings.  1971 Md. Laws, ch. 663 (enacting Art. 41, § 257-J, now codified as amended at PS § 12-201).  This code was to be consistent with the rules for industrialized buildings but only "to the extent practicable."

*Id.* Thus, the Legislature contemplated, and the appropriate agency created, distinct regulatory codes for each of the three building categories.

In 1976, following enactment of the federal manufactured home statute, Pub. L. No. 93-383, tit. VI, 88 Stat. 633, 700 (1974), the General Assembly deleted the State statute's substantive provisions for manufactured homes, and substituted provisions authorizing the State to administer the Federal Act as HUD's delegate. 1976 Md. Laws, ch. 422. This was a further marker of legislative intent that manufactured homes be subject to a separate regulatory scheme—now primarily federal, with the possibility of limited State-law supplementation. *See* PS §§ 12-305(d), 12-312. When the General Assembly enacted the MBPS statute in 1993, nothing in its text or legislative history suggested an intent to change this established system and subject site-built homes and manufactured homes to the same code for the first time, especially given that manufactured homes were already subject to the HUD standards. Modular homes, too, remained subject to their own regulatory scheme, based on but distinct from the MBPS. *See* PS § 12-305; COMAR 09.12.52.07. To be sure, in 2012, the General Assembly enacted a statute prohibiting local governments from weakening the MBPS fire sprinkler requirements for those one- and two-family homes that were subject to the MBPS. 2012 Md. Laws, chs. 265, 266 (enacting PS § 12-504(a)(1)(iii)). But that enactment did not purport to extend the MBPS—i.e., to apply the fire sprinkler mandate to manufactured homes for the first time—only to protect the MBPS provisions' existing application from local interference. The State Fire Marshal, testifying in support of the 2012 legislation, did state that he believed, as a matter of policy, that a fire-sprinkler mandate should apply to all types of homes including manufactured homes. *See Hearing on S.B. 602 Before the Senate Educ., Health & Env'tl Affairs Comm.*, 2012 Leg., Reg. Sess. (Mar. 6, 2012) (statement of the State Fire Marshal); *Hearing on H.B. 366 Before the House Env'tl Matters Comm.*, 2012 Leg., Reg. Sess. (Feb. 16, 2012) (statement of the State Fire Marshal). But there is no indication that he thought § 12-504(a)(1)(iii) would have that effect or, even if he did, that the General Assembly agreed.

Our prior opinion on a similar issue also supports the conclusion that the General Assembly did not intend to apply the MBPS to manufactured homes by implication in PS § 12-503(c). Shortly after the General Assembly first enacted legislation governing "industrialized buildings" (a category that includes modular homes but not manufactured homes), we opined that the State Plumbing Regulations issued by the then-Department of

Licensing and Regulation did not apply to industrialized buildings, and that only the construction code adopted by DECD specifically for industrialized buildings governed plumbing requirements for those buildings. 58 *Opinions of the Attorney General* 240, 245 (1973). We reasoned there that the General Assembly did not intend industrialized buildings to be subject to two sets of partially overlapping State-enacted plumbing regulations. *See id.* at 242-44. The same rationale should apply here: because the General Assembly in 1993 understood that manufactured homes were already subject to their own pre-existing statutory and regulatory building code, mostly flowing from the HUD standards, it is unlikely that there was an intent to also subject them to a second, overlapping building code, the MBPS.

An interpretation that would purport to impose the entire MBPS on manufactured homes could also raise obstacle preemption concerns under the Federal Act, even if its application were limited to areas where the Federal Act is silent. While Congress clearly contemplated that a state or local government could impose individual, specific requirements on manufactured homes, *see* 42 U.S.C. § 5422(a), there would at least be a question as to whether Congress expected a state to be able to impose a complete, largely overlapping building code, designed for site-built homes, onto HUD-regulated manufactured homes as well. *See Scurlock v. City of Lynn Haven*, 858 F.2d 1521, 1525 (11th Cir. 1988) (holding that city could not use zoning ordinance to require manufactured homes to comply with a standardized building code other than the HUD standards); *Colorado Mfr'd Hous. Ass'n v. Board of County Comm'rs*, 946 F. Supp. 1539, 1552-53 (D. Colo. 1996) (same). That approach by a state would work a much greater interference with the administration and national uniformity of the HUD standards than would a standalone fire sprinkler requirement. *See* 42 U.S.C. §§ 5401, 5403(d). Although we do not resolve that preemption question here, these potential preemption concerns lead us to favor a reading of PS § 12-503(c) that does not purport to apply the full set of MBPS provisions to manufactured homes, especially in the absence of any clear legislative intent to do so. *See, e.g.*, *Bank of Am. v. Stine*, 379 Md. 76, 90 (2003) (State statutes should be construed to avoid federal preemption concerns where possible).

DOL's regulations for manufactured and modular buildings also align with this conclusion. Those regulations are found in a separate chapter from the MBPS regulations, *see* COMAR 09.12.52, a further indication that non-site-built homes are not subject to the MBPS. The scope provision in these regulations

explains that the HUD standards generally supersede the State's regulation of manufactured homes and notes only one express exception where the agency's regulations do in fact cover manufactured homes, namely, COMAR 09.12.52.15. *See* COMAR 09.12.52.01B. COMAR 09.12.52.15, in turn, imposes only limited requirements on manufactured homes, relating to auxiliary issues such as manufactured home installation and local code enforcement, declaring that the Federal Act otherwise gives HUD "complete jurisdiction over the design and construction of manufactured homes" and "supersedes all state laws on this subject." And nowhere in these regulations governing manufactured homes is there any suggestion that the provisions in the separate MBPS regulations apply. These regulations thus signify a regulatory intent that manufactured home construction and safety be governed by federal law.

Finally, the relevant State agencies' interpretation of the governing statutes and regulations as not requiring fire sprinklers in manufactured homes should resolve any remaining doubts. An agency's interpretation of the statute it administers is ordinarily entitled to deference, as is an agency's interpretation of its own regulations. *See, e.g.*, *Kor-Ko Ltd. v. Maryland Dep't of Env't*, 451 Md. 401, 412 (2017). DHCD had, until recently, authority to regulate manufactured home construction and safety, *see* PS § 12-305(d), and the State Fire Marshal has authority to enforce the State's fire sprinkler mandate, *see* PS § 6-305(a)(3). Both of these agencies have opined that State law does not require fire sprinklers in manufactured homes. *See* Wang Memorandum, *supra*; Fire Marshal Memorandum, *supra*. Specifically, both have taken the view that the only State regulation applicable to manufactured home construction and safety is COMAR 09.12.52.15, which does not contain a sprinkler mandate. *See* Wang Memorandum, *supra*, at 1; Fire Marshal Memorandum, *supra*, at 1. Nor has DOL adopted a different position since inheriting DHCD's former authority over manufactured homes. Deference to the agencies' expertise further bolsters the conclusion that manufactured homes are not subject to the sprinkler mandate.

### III
### Conclusion

In sum, federal law would not preempt a State requirement that manufactured homes be equipped with fire sprinklers. But although the Maryland Building Performance Standards, incorporating the International Residential Code, do require fire sprinklers in "site-built" one- and two-family homes (and separate

regulations require fire sprinklers in one- and two-family modular homes), the General Assembly did not intend the Maryland Building Performance Standards to apply to manufactured homes, which have been subject to their own regulatory regime—the HUD standards—since long before the General Assembly established the MBPS. Thus, State law does not currently require fire sprinklers in manufactured homes.

Brian E. Frosh
Attorney General of Maryland

Thomas S. Chapman
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice